IN THE MATTER OF LESTER T. VINCENTI, AN
ATTORNEY-AT-LAW.

Argued March 22, 1983—Decided April 27, 1983.

*Richard J. Engelhardt,* Staff Attorney, argued the cause for complainant Disciplinary Review Board (*Colette A. Coolbaugh,* Secretary, attorney).

*Michael A. Cohan* and *Lester T. Vincenti, pro se,* argued the cause for respondent.

PER CURIAM.

Under some circumstances it might be difficult to determine precisely the point at which forceful, aggressive trial advocacy crosses the line into the forbidden territory of an ethical violation. But no matter where in the spectrum of courtroom behavior we would draw that line, no matter how indulgent our view of acceptable professional conduct might be, it is inconceivable that the instances of respondent's demeanor that we are called upon to review in these proceedings could ever be countenanced. The record lays bare a shameful display of atrocious deportment calling for substantial discipline.

I

A panel of the local ethics committee (Committee) prepared a carefully documented report of 60 pages, unanimously adopted by the Committee as its presentment charging respondent with unethical conduct. With equally meticulous care the Disciplinary Review Board (DRB) embodied its determination, with which we are in accord, in a Decision and Recommendation. Our independent review of the entire record leads us to the same conclusion as was reached by the DRB, whose full opinion we here set forth and adopt as our own.

This matter is before the Board based upon a presentment filed by the District V Ethics Committee. That presentment outlines misconduct by the respondent in two separate court proceedings. These matters may be summarized as follows:

## I.  COOLBAUGH v. VINCENTI (V–80–103E)

The respondent represented D.K., the defendant in a child abuse/neglect case involving the defendant's four children.  Trial of this matter before the Superior Court, Union County, began on September 16, 1979, and continued to December.  During this proceeding, respondent's in-court conduct, his out of court conduct towards lawyers, witnesses and bystanders in the courthouse, and his written communiques and applications relative to the D.K. proceeding reached a level of impropriety that mandated the filing of a 22 count ethics complaint.

The specific instances of in-court misconduct are fully detailed in the lengthy ethics complaint and, to a lesser degree, in the presentment filed by District V, and need not be fully detailed herein.  It is sufficient to note examples of respondent's numerous improprieties here.  He was frequently sarcastic, disrespectful and irrational, and accused the Court on numerous occasions of, *inter alia,* collusion with the prosecution, cronyism, racism, permitting the proceedings to have a "carnival nature", conducting a kangaroo court, prejudging the case, conducting a "cockamamie charade of witnesses" and barring defense counsel from effectively participating in the proceedings, conducting a sham hearing, acting outside the law, being caught up in his "own little dream world", and ex-parte communications with the prosecutor together with other equally outrageous, disrespectful and unsupported charges.  These and other comments were made frequently throughout the proceedings and continued at length.

The Committee specifically found that the respondent's conduct exhibited a "constant and deliberate disregard of the minimum standards of conduct expected of a member of the bar" through his repeated discourteous, insulting and degrading verbal attacks on the judge and his rulings, and that these repeated discourses substantially interfered with the orderly process of the trial.  The Committee discounted respondent's claim that his conduct was the result of zealously protecting his client's cause as well as the emotional undercurrent of the litigation.  To the contrary, the Committee concluded that the

pervasiveness of the irrational, intemperate and improper conduct compelled the determination that the respondent's perception of the lawyer's role and his relationship to the court was, at the least, misguided. The Committee concluded that the respondent, in his court appearances, was guilty of unprofessional conduct in violation of DR 1–102(A)(5) and (6), DR 7–106(C)(6), and DR 8–102(B) [prohibiting, respectively, conduct that is prejudicial to the administration of justice, conduct that adversely reflects on one's ability to practice law, undignified or discourteous conduct that is degrading to a tribunal, and the knowing making of false accusations against a judge].

In addition to verbal attacks in the courtroom, respondent engaged in collateral actions that the Committee determined were designed to gain advantages in the pending litigation by demeaning and harassing both the judge and opposing counsel. This conduct includes the forwarding of a letter to both the Deputy Attorney General representing the Division of Youth and Family Services (DYFS) and the Assistant Public Defender who was the statutory law guardian to the four children. Within that letter, respondent demanded that these attorneys remove themselves from the case because of what he perceived to be their breach of confidentiality of the case. He further advised that he had asked their superiors to remove them from the case. He did, indeed, forward that letter to both the Attorney General and the Public Defender. The charged improprieties had no basis in fact. To the contrary, any improprieties that occurred at the meeting in question actually were of his doing. See discussion of out-of-court behavior below.

In another instance, the respondent reviewed a witness's files while she was testifying and failed to return them thereafter. The Deputy Attorney General located the files on the counsel table and returned them to the witness, at the witness's request. The respondent, in open court, then accused the Deputy Attorney General of stealing the files, and accused her of being a "bald-faced liar", and "a thief, a liar and a cheat". He also filed an ethics complaint against the Deputy Attorney General for

her actions. The Committee concluded that in these two incidents, respondent was in violation of DR 7–102(A)(1) and (5), and DR 7–106(C)(6) [governing the representation of a client within the bounds of the law and proscribing certain trial conduct].

Even more egregious were the respondent's activities with regard to evaluation of respondent's client by a court appointed psychologist. Respondent's client had paid $300 to Dr. Bennett, the psychologist, at the time of evaluation. Although the trial judge had arranged the appointment, he did not discuss compensation with Dr. Bennett until after respondent objected to his client being charged. The Judge agreed that the State should pay the fee, and on November 26, 1979, so advised the psychologist. When Dr. Bennett appeared to testify on November 29, 1979, he gave respondent a check for $300, thus returning the fee inadvertently received from the respondent. Despite the fact that the misunderstanding regarding payment for the evaluation had been resolved, respondent proceeded to subpoena the trial judge to testify and moved for the Judge's disqualification, stating that the matter involved " * * * a possible collusion between a witness (and) the Court". Additionally, he called Dr. Bennett an "extortionist psychologist", and alleged an appearance of impropriety since " * * * the individual that sits on the stand extorted money from my client on the advice of this Court".

In addition to making these claims in open court, in his appeals to the Appellate Division and the Supreme Court, the respondent further alleged that the trial judge had participated in extortion as well as cronyism, bias, prejudice, racism and religious bigotry during the trial, again without any basis in fact.

The respondent's improprieties continued. The respondent directed the following letter, dated December 13, 1979, to the trial judge, the text of which is set forth below:

I wish to extend my sincerest good wishes for your speedy recovery from the obvious breakdown you suffered in chambers yesterday, Tuesday, December 11, 1979.

Hopefully, with some rest and relaxation from your most taxing schedule, you will be in a position to resume your judicial duties more appropriately than exhibited on the eleventh.

If, however, you feel somehow justified in pressing your demand for written recommendations, I must supply them, if for no other purpose than to demonstrate my client's continuing bona fides herein.

I must admit, with no small degree of trepidation, that we have no confidence in your rationality vis-a-vis this case. Your activities on the eleventh and throughout the trial clearly demonstrate an irrational predisposition to chastise Mr. D.K. and defense counsel. The cronyism I wrote of in our motion for new trial continues unabated.

You have simply closed your mind to our position and have retreated into a dream world not unlike the somnambulist in that early German classic story at the turn of the century.

How do we make any kind of recommendations to you while you sleep-walk through your judicial duties. How does one get through to you.

Regrettably, we have no faith in your ability to preserve your objectivity herein, for whatever reason(s) I don't know.

Mr. D.K.'s recommendations as to disposition are as follows without detailing the charade you are conducting:

1. Give him back his kids forthwith.

2. He, the children, the KXs, T. and B.P., and P.P. ought to agree to have counseling aimed at retrieving their emotional equilibrium which has been so assaulted by this Court and the State for much too long.

3. Re-establish by some appropriately reasonable means the control and authority of Mr. D.K. over his children which you have so blatantly and for too long disregarded.

4. Allow Mr. D.K. to prescribe the mode, method and style of life for his kids, including their religion until their majority.

5. Recognize your own participation in the State's oppression of a member of a bona fide religious minority, the Jehovah's Witnesses, as my people's constitutional right to freedom of religion.

I must inform you that I have made an application to the Hon. _____ in response to your attorney's application to quash our subpoena of you to remove you from this case, once again. Parenthetically, your overly strong protest of that subpoena belies your professed inadvertent participation in Bennett's extortion. There is no better proof of your irrational conduct herein than your continued refusal to disqualify yourself and testify under oath as to the extortion episode.

Your refusal to control your people, Ms. Rem, and the Division is only fitting when viewed in light of your refusal to control yourself.

I would respectfully suggest that you await Judge _____ order before adding further insult to the injuries perpetrated upon Mr. D.K. by entering any dispositional order herein.

The statements made by respondent in that letter speak for themselves.

In a further display of impropriety, the respondent included the following accusations against the trial judge in his Specification of Trial Errors that accompanied his motion for a new trial following conclusion of the fact-finding phase of the bifurcated child abuse proceeding:

1. Improper coaching of the Deputy Attorney General;

2. Continuous coaching of the Law Guardian;

3. Usurpation of the presentation of the State's case to establish the elements of that entire case;

4. Cross examination of defense witnesses to discredit them;

5. Disregard for the perjury of the State's witnesses;

6. Bias and prejudice in favor of the State;

7. Over-interest, concern, cronyism and improper contact between the Court, Deputy Attorney General, law guardian and legal staff of the trial court;

8. Obvious racism in the Court's application of racial tests with regard to the children's schooling;

9. Perfidy by the Court and State in failing to properly enumerate the bases for allegations of abuse and neglect;

10. Carnival nature of the atmosphere in the courtroom.

The Committee concluded that these various written and oral statements violated DR 1–102(A)(4), (5) and (6) [misconduct]; DR 7–102(A)(1) and (5) [representing a client within the bounds of the law]; and DR 8–102(B) [prohibiting the knowing making of false accusations against a judge].

In addition to respondent's outrageous in-court conduct and equally outrageous written applications and communications, respondent, on numerous occasions, also engaged in reprehensible behavior towards witnesses, potential witnesses, opposing counsel, and other attorneys outside the courtroom but inside the Courthouse. A sampling of the improprieties follows:

1. On September 26, 1979 outside the courtroom, respondent and Assistant Public Defender Eisert were discussing the issues of visitation. Argument ensued, during which, among other obscenities, respondent told Eisert to "go screw himself" and "fuck off", and referred to Eisert as "asshole", "schmuck" and "schmuckface", all in the presence of a number of individuals, some of whom were involved in the case.

2. On October 31, 1979, Deputy Attorney General Rem and Eisert agreed to meet with respondent, at his request, for a settlement conference. The Lawyer's Lounge was selected. In addition to addressing insults at Rem, respondent referred to a female attorney, also in the lounge, as "Miss Wrinkles", "Miss Bags" and "old bag", and stated to her: "Shove it up your ass" and "go fuck yourself". It was following this meeting that respondent addressed his written removal request, discussed *supra,* to opposing counsel and their superiors.

3. Respondent on several occasions either unnecessarily subpoenaed individuals to testify or threatened those under subpoena by opposing counsel.

4. On December 6, 1979, in the Courthouse corridor, after attempting to intimidate a witness by directing her to answer everything he asked, while his secretary wrote down her responses, respondent advised an attorney named Pearson who was standing with the witness but not involved in the proceeding to "just keep your god damn nose out of my business". His conversation thereafter was peppered with the phrase "fuck you". Eisert, who at that point asked respondent's secretary if she was recording the obscene remarks, was charged by respondent, who pressed a Bic pen into Eisert's chest.

About ½ hour later, respondent approached Pearson, demanding his card, indicating that it was needed to file an ethics complaint. When Pearson refused to give respondent a card, respondent persisted in his demands in a loud manner, punctuating the demands with questionable phrases, including "shmuckface", "fuck-face" and "shit-head". He continued in this manner for sometime, adding to his action by poking his finger in Pearson's chest. Prior to removing himself from the area, respondent intentionally bumped Pearson with his stomach and then his shoulder, and thereafter advised Pearson that he could take his law firm and "shove it up my ass".

Respondent's performance did not conclude there. While Eisert, Pearson and Rem were conversing in the Courthouse, respondent approached, stating loudly that Rem should not be believed since " * * * she's a bald-faced liar". He then called Rem "fuckface", and while walking away again made the suggestion " * * * shove it up your ass". Within the next several minutes, respondent twice approached the group, each time pushing into Rem, causing her to lurch against a desk in the hallway.

The Committee concluded that these actions of the respondent were designed to ridicule, embarrass and harass the individuals concerned, and in the case of his adversaries, his conduct was designed to intimidate them in the performance of their duties. The Committee therefore found that respondent had violated DR 1–102(A)(5) and (6).

## II. BALDASARRE CONTEMPT (V–80–163E)

In March of 1980 the respondent was acting as counsel for the defendant in the case of *Baldasarre v. Baldasarre,* a matrimonial matter. On March 7th, the respondent was held in contempt by

the trial judge and fined $250 for conduct which bears a strong resemblance to respondent's conduct delineated above. In *Baldasarre*, the respondent's belligerent attitude toward the Court led the Judge to advise that he was leaving the bench and would return when respondent had had " * * * an opportunity to collect himself". Respondent replied: "I don't need to collect myself, Judge, you are simply ridiculous, you know".

Respondent appealed the finding of contempt. In affirming the court's action, the Appellate Division found that respondent's conduct interfered with the in-court proceedings and was "insulting".

The Committee found that respondent's conduct "demonstrate(d) a pattern of abuse consistent with that exhibited in the D.K. matter." Therefore, the Committee concluded that respondent had violated DR 1–102(A)(5) and (6) and DR 7–106(C)(6).

## CONCLUSION AND RECOMMENDATION

Upon a review of the full record, the Board is satisfied that the conclusions of the Committee in finding unethical conduct on the part of respondent are fully supported by clear and convincing evidence.

The respondent engaged in a calculated pattern of irresponsible, abusive and obnoxious behavior both in and outside of the courtroom during the DYFS v. D.K. trial. The Board is convinced that respondent, by both physical contact and verbal and written abusive language, as well as by threatening and, in one instance, filing an ethics complaint against other counsel, intended to intimidate all parties involved in the proceedings, including witnesses, other counsel and the Judge. The respondent's claim that he was acting in the interests of his client and that his claims of, *inter alia,* racism, extortion, and cronyism, have some factual basis is not supported by the record, and the Board specifically finds these claims to be incredible. Indeed, the transcript of the DYFS v. D.K. trial, the testimony of respondent before both the Board and the Committee and the

documents admitted into evidence, compel the conclusion that respondent's conduct was intentional and that respondent fails to comprehend either the judicial role or the role of an advocate in a court proceeding. Respondent's actions were neither necessary nor desirable for the proper presentation of matters to the court. To the contrary, his actions far exceeded the limits of zealous advocacy. His overall conduct, including his performances in the courtroom and courthouse, and his improper letters and his applications to various persons and Courts, was reprehensible. The Board condemns in particular the respondent's letter of December 13, 1979 to the trial judge in the DYFS v. D.K. matter, which event was well beyond the bounds of reasonable or appropriate conduct towards a Judge by an attorney, and was, in both tone and content, odious.

At hearing before the Board, and in his subsequent brief, respondent claimed procedural deficiencies in the ethics proceeding, alleging a "shotgun approach" in charging him with ethical violations in the DYFS v. D.K. proceeding and a lack of notice of the charges. The Board finds no merit whatsoever to this claim. The detailed, 22 count ethics complaint was painfully specific as to the many ethics violations committed by the respondent, including the charge of intimidation. Additionally, the respondent was permitted a full and fair opportunity to respond to these charges at hearing before the District V Ethics Committee. Any irregularities in the proceeding occurred prior to the filing of the amended complaint, and were cured by full compliance with the rules from that point forward. Furthermore, reliance by respondent on *In re Hinds,* 90 *N.J.* 604 (1982), and *In re Rachmiel,* 90 *N.J.* 646 (1982), is inappropriate. Neither of these cases bears any relationship to the case at hand.

The Board finds that respondent has violated DR 1–102(A)(4), (5) and (6); DR 7–102(A)(1) and (5); DR 8–102(B); and DR 7–106(C)(6). Violations of this nature require the imposition of public discipline. See *In re Mezzacca,* 67 *N.J.* 387 (1975), where an attorney's rude intimidating and disruptive conduct during a short administrative hearing resulted in only a public repri-

mand; and *In re McAlevy*, 69 *N.J.* 349 (1976), where the respondent, in court, threatened physical violence and the next morning in chambers flew into a rage and attacked opposing counsel, ultimately involving the judge and his clerk in the melee. In only severely reprimanding respondent for the two related incidents that occurred within a 24 hour period, the Court noted the respondent's contrition and apology.

"Vilification, intimidation, abuse and threats have no place in the legal arsenal." *In re Mezzacca, supra*, 67 *N.J.* at 389–90. "An attorney who exhibits the lack of civility, good manners and common courtesy here displayed tarnishes the entire image of what the bar stands for." *In re McAlevy, supra*, 69 *N.J.* at 392. In the case at hand, respondent's misconduct not only far exceeded that complained of in *McAlevy* and *Mezzacca* but apparently represents a pattern of conduct by respondent as is evidenced by the *Baldasarre* episode. Additionally, the respondent continues to argue that he committed no ethical violations. The Board therefore concludes that discipline more severe than a public reprimand is warranted, and unanimously recommends that respondent be suspended for a period of one year.

The Board further recommends that the respondent be required to reimburse the Administrative Office of the Courts for appropriate administrative costs, including production of transcripts.

[Footnote omitted.]

## II

As the foregoing comprehensive report demonstrates, respondent was guilty of behavioral delinquencies transcending any notion of decent advocacy. Were the reader to entertain any doubts on that score, they would be dispelled by a reading of the even more detailed account contained in the Committee's report. That respondent would seek to justify his conduct on the basis of forceful and zealous representation of his client simply underscores his flawed perception of a lawyer's obligation to the court, to other attorneys, and to witnesses, as set forth in the

various Disciplinary Rules cited in the DRB report. We are not confronted here with an isolated example of loss of composure brought on by the emotion of the moment; rather, the numerous instances of impropriety pervaded the proceedings over a period of three months. They are susceptible of no other interpretation than that respondent was attempting to intimidate, threaten, and bully those whose interests did not coincide with his own or his client's. Nor can we lose sight of the fact that the dust had barely settled on the DYFS v. D.K. proceedings before respondent saw fit, within three months, to turn his vituperation loose on another judge, in the Baldasarre matter. The contours of a pattern of misbehavior are etched all too clearly.

The shame of it is that respondent does not yet appear fully to appreciate the magnitude of his offense; for when asked at oral argument before this Court whether he was prepared to acknowledge that he had been guilty of an ethical violation, respondent was unable to muster up any more directly responsive answer than "[a]s far as an ethics violation in the sense of morally reprehensible acts, motivated with a bad intent—no", conceding only that he may have been "stupid" and that "loss of temper" had played a role in his predicament. As we have demonstrated, the record evinces far more—and much worse—than mere obtuseness and truculence.

### III

We would hope, through this opinion, to serve some more salutary purpose than just the distasteful meting out of well-deserved public disciplining to Mr. Vincenti. As pointed out earlier, *supra* at 592, this ethics proceeding unveils conduct so bizarre, so outrageous, as not to bring us close to what in some other case might be the difficult problem of distinguishing between permissibly vigorous advocacy and an ethical transgression. Although we need not here attempt with exquisite precision to delineate the difference, it may neverthe-

less be useful to restate, in general terms, the obligation of New Jersey lawyers, that they may readily avoid entanglements of the sort that brings respondent before us.

Models abound. We adopt one formulated by Justice Frank-furter:

> Certainly since the time of Edward I, through all the vicissitudes of seven centuries of Anglo-American history, the legal profession has played a role all its own. The bar has not enjoyed prerogatives; it has been entrusted with anxious responsibilities. One does not have to inhale the self-adulatory bombast of after-dinner speeches to affirm that all the interests of man that are comprised under the constitutional guarantees given to "life, liberty and property" are in the professional keeping of lawyers. It is a fair characterization of the lawyer's responsibility in our society that he stands "as a shield," to quote Devlin, J., in defense of right and to ward off wrong. From a profession charged with such responsibilities there must be exacted those qualities of truth-speaking, of a high sense of honor, of granite discretion, of the strictest observance of fiduciary responsibility, that have, through the centuries, been compendiously described as "moral character." [*Schware v. Board of Examiners*, 353 *U.S.* 232, 247, 77 *S.Ct.* 752, 760–761, 1 *L.Ed.2d* 796, 806 (1957) (Frankfurter, J., concurring).]

■ As applied to courtroom decorum, which is involved in both DYFS v. D.K. and Baldasarre, we think the principles extracted from the foregoing passage translate into a requirement that lawyers display a courteous and respectful attitude not only towards the court but towards opposing counsel, parties in the case, witnesses, court officers, clerks—in short, towards everyone and anyone who has anything to do with the legal process. Bullying and insults are no part of a lawyer's arsenal.

The prohibition of our Disciplinary Rules against "undignified or discourteous conduct * * * degrading to a tribunal", DR 7–106(C)(6), is not for the sake of the presiding judge but for the sake of the office he or she holds. Respect for and confidence in the judicial office are essential to the maintenance of any orderly system of justice. This is not to suggest that a lawyer should be other than vigorous, even persistent, in the presentation of a case; nor is it to overlook the reciprocal responsibility of courtesy and respect that the judge owes to the lawyer. Unless these respective obligations are scrupulously honored, a trial court will be inhibited in performing two essential tasks:

sifting through conflicting versions of the facts to discover where the truth lies, and applying the correct legal principles to the facts as found. Under the best of circumstances these tasks are difficult; without an orderly environment they can be rendered impossible.

> Unless order is maintained in the courtroom and disruption prevented, reason cannot prevail and constitutional rights to liberty, freedom and equality under law cannot be protected. The dignity, decorum and courtesy [that] have traditionally characterized the courts of civilized nations are not empty formalities. They are essential to an atmosphere in which justice can be done. [*Code of Trial Conduct* § 17 (American College of Trial Lawyers 1983).]

## IV

■ Respondent is suspended from the practice of law for one year and until the further order of the Court. He is further required to reimburse the Administrative Office of the Courts for appropriate administrative costs, including the cost of producing transcripts.

So ordered.

*For suspension* —Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN and GARIBALDI—6.

*Opposed* —None.

## ORDER

It is ORDERED that LESTER T. VINCENTI of NEW BRUNSWICK be suspended from the practice of law for one year and until further order of this Court, effective May 16, 1983; and it is further

ORDERED that respondent reimburse the Administrative Office of the Courts for appropriate administrative costs, including the cost of producing transcripts; and it is further

ORDERED that respondent is restrained and enjoined from practicing law during the period of his suspension; and it is further

ORDERED that respondent comply with all the Regulations of the Disciplinary Review Board governing suspended, disbarred or resigned attorneys.