969 P.2d 1285

**OFFICE OF DISCIPLINARY COUNSEL, Petitioner,**

v.

**Myles S. BREINER, Respondent.**

No. 21708.

Supreme Court of Hawai'i.

Jan. 4, 1999.

As Amended Jan. 11, 1999.

See also, 85 Hawai'i 462, 946 P.2d 32.

Brian C. Means, Assistant Disciplinary Counsel, (Carole R. Richelieu, Chief Disciplinary Counsel with him on the brief), for Petitioner Office of Disciplinary Counsel.

Michael Jay Green and David J. Gierlach, on the briefs, Honolulu, for Respondent Myles S. Breiner.

MOON, C.J., and KLEIN, LEVINSON, NAKAYAMA and RAMIL, JJ.

PER CURIAM.

The Disciplinary Board has filed a report, pursuant to Rule 2.7(d) of the Rules of the Supreme Court of the State of Hawai'i (RSCH). The report, based upon a stipulation of facts and rules violations between the respondent Myles S. Breiner and the petitioner Office of Disciplinary Counsel, recommends that Breiner be suspended from the practice of law for a period of sixty (60) days.

We accept the stipulation of facts and rules violations. For the reasons set forth below, however, we suspend Breiner from the practice of law for a period of six (6) months. A separate suspension order is entered with this opinion.

## I. *STIPULATION*

Disciplinary Counsel and Breiner stipulated that Breiner violated Rule 3.5(c) of the Hawai'i Rules of Professional Conduct (HRPC)[1] four times during his representation of a criminal defendant, Raita Fukusaku. *See State v. Fukusaku,* 85 Hawai'i 462, 946 P.2d 32 (1997). In sum, Breiner failed to heed the trial court's admonitions regarding (1) argument during opening statements, (2) being argumentative with and disrespectful to a witness, and (3) twice making improper comments in the presence of the jury. The details of Breiner's behavior are set out below and in our opinion in *Fukusaku,* 85 Hawai'i at 483–485 & nn.17–20, 946 P.2d at 53–55 & nn.17–20.

The trial judge first cited Breiner for contempt of court after Breiner refused to desist from arguing during his opening statement. The record reflects that Breiner was stubborn, argumentative, sarcastic, and disrespectful; as illustrated by the following exchange:

THE COURT:

Mr. Breiner, this is opening statement, not argument.

BREINER:

I'm not arguing, stating the facts.

THE COURT:

You're arguing.

BREINER:

I'm not. I'm continuing. If you want to hold me in contempt, I apologize, I'm not arguing.

THE COURT:

If you do it again, I'll hold you in contempt.

BREINER:

Have to face it, I'm not.

THE COURT:

You're arguing.

BREINER:

I'm not. I'm stating facts they left off in the opening.

THE COURT:

Not true, you have no authority to say—

BREINER:

Not argument.

THE COURT:

This is argument.

BREINER:

We can go over and over this, I stated at the outset what I would prove, that's what I'm doing.

THE COURT:

Do not enter into argument. I've warned you, this is the last warning.

BREINER:

To what extent are you going to help the prosecution with this case?

THE COURT:

No intention of helping either party. Proceed.

In February 1995, when Breiner engaged in the behavior to which he stipulated, HRPC 3.5(c) provided:
> (c) Disruption of Tribunal. A lawyer shall not engage in conduct intended to disrupt a tribunal.

---

1. HRPC 3.5(c) currently provides:

    (c) Disruption of Tribunal. A lawyer shall not engage in conduct intended or reasonably likely to disrupt a tribunal.

BREINER:

Seem to be helping, prosecution openly argued her case, you didn't admonish her.

THE COURT:

You're afraid to object?

BREINER:

Afraid? That's beautiful.

Breiner then resumed his opening statement to the jury:

Shortly, in short, ladies and gentlemen, we will prove that in order to find Raita Fukusaku guilty you have to assume he did everything possible to make himself the suspect short of calling up Keith Kaneshiro [the Prosecutor] and saying I did it.

The deputy prosecuting attorney (DPA) objected and argued that Breiner was being argumentative again. The trial court agreed and, out of the presence of the jury, cited Breiner for criminal contempt.

The second instance of criminal contempt occurred after Breiner (1) was disrespectful to a prosecution witness, Kanthi De Alwis, M.D. (the medical examiner), during cross-examination of her and (2) addressed condescending remarks to the trial court:

BREINER:

Doctor, is there a problem answering yes or no to my responses?

DPA:

Objection, Your Honor.

BREINER:

Nonresponsive. Your Honor, self-serving responses to the jury. I'm asking for a yes or no response. Very simple.

DPA:

Your Honor, may we approach the bench, please.

BREINER:

What are you trying to conduct it from?

DPA:

Your Honor, may we approach the bench? I have an objection.

THE COURT:

Counsel. Mr. Breiner. Approach the bench.

DPA:

Your Honor, the State's objection is that Mr. Breiner is being argumentative with this witness and he is not treating her with common courtesy. I have no problems with him asking questions per the area at issue. But for him to constantly interrupt here in the fashion that he's done at this point in time is—I think is inappropriate and does a disservice to this entire trial.

THE COURT:

The next time you're disrespectful to this witness, I will find you in contempt of court. The next time you're disrespectful to this Court, I will find you in contempt.

BREINER:

Excuse me. Let's put it on the record so we understand something here. One, I take your comments as a threat.

THE COURT:

You can take it whichever way you want.

BREINER:

Just for the record, you're threatening me? I will conduct myself as I see fit.

THE COURT:

You do not see fit clearly, Mr. Breiner. I asked you continuously throughout these proceedings.

BREINER:

Excuse me. Can I place myself on the record without being interrupted? Thank you. You look like you're about to explode.

THE COURT:

I'm not. You're the one who's going to suffer the consequences, Mr. Breiner. I am telling you, if you continue on like this, you force me to find you in contempt, and I will do so, Mr. Breiner.

BREINER:

I'm not asking you to find me in contempt, Your Honor. You see what she's doing? Apparently, I ask for a yes or no response to a yes or no question. Instead, she turns to the jury and starts giving these self-serving answers. I try to object to them; Counsel jumps up and starts making objections. I was still waiting for a ruling to my objection.

THE COURT:

I will rule, and you will accept my ruling as I rule them. If you don't like them, you can take it up on appeal. Proceed.

After the foregoing exchange, Breiner continued crossexamining Dr. De Alwis:

BREINER:

Is it fair to say that that woman was beaten, rather severely?

DE ALWIS:

No.

BREINER:

No? All those injuries, is that a light beating? A medium beating?

DE ALWIS:

Pressure—You want me to go into detail?

BREINER:

I'm asking a simple question. I'm not asking you to describe pressure or compression or whatever, Doctor. I'm asking you a specific question. I asked you, is it fair to say the woman was beaten—just simply beaten. Yes or no.

DE ALWIS:

In my opinion, the contusions that I found—

BREINER:

Move to strike as nonresponsive, Your Honor. I asked a simple question, yes or no.

THE COURT:

Doctor De Alwis, please just answer the question.

BREINER:

Can you answer the question, Doctor, yes or no. Was she beaten? I'll ask you the third time. Yes or no, was she beaten?

DE ALWIS:

Can you give me a little bit of time, please.

THE COURT:

Counsel, give her the opportunity to answer the question.

BREINER:

I've only asked it four times.

THE COURT:

Counsel—

DPA:

Objection. Counsel's commenting, Your Honor.

THE COURT:

Mr. Breiner. We'll take a recess at this time.

After excusing the jury, the trial court cited Breiner for criminal contempt of court. The trial court noted that it had warned Breiner several times, both in court and in chambers, that the court had previously advised Breiner that it would instruct the witness if Breiner wished the court to do so, but that Breiner was continuing to defy the court's admonition. The trial court characterized Breiner's behavior as "disruptive, uncivil, [and] contemptuous." The trial court stated that it and everyone was "tired" of Breiner's behavior and "weary of [Breiner's] obvious disregard of the rules of conduct and [Breiner's] behavior in this courtroom."

The third instance of criminal contempt of court transpired when Breiner was cross-examining another prosecution witness, Calvin Mitchell Woods:

THE COURT:

Just a minute. There's an objection.

BREINER:

I'm still asking the question.

THE COURT:

Counsel, you can't ask—

BREINER:

She's interrupting—she's interrupting me intentionally to interfere with the flow of cross-examination and she knows that.

THE COURT:

Mr. Breiner.

DPA:

Your Honor, may we approach?

During the ensuing bench conference, the trial court reminded Breiner that it had previously warned him about "this type of outburst," scolded Breiner for making improper comments before the jury, characterized Breiner's conduct as "disrespectful and disruptive," and noted that Breiner had "continually challenged [the] Court." The trial court again found Breiner in criminal contempt of court.

The fourth incident occurred when the trial court called for a bench conference during the DPA's direct examination of yet another witness, Julie Ann Cooper. While *en route* to the bench, Breiner muttered, in a tone loud enough for the jury to overhear, "I'm tired of this crap." The trial court cited Breiner for criminal contempt of court.

Although the Disciplinary Board's report and recommendation only address the incidents described above, the record that was before us in *Fukusaku,* of which we take judicial notice, reflects, *inter alia,* that Breiner also characterized the proceedings as a "kangaroo court" and then, pursuing the metaphor in a testy exchange with the trial court, explained that he was not a "marsupial."

Respondent Breiner and Disciplinary Counsel stipulated to four aggravating factors: (1) prior discipline (a public reprimand and a private informal admonition); (2) a pattern of misconduct; (3) multiple offenses; and (4) substantial experience in the practice of law. They also stipulated to three mitigating factors: (1) a cooperative attitude toward the disciplinary proceedings; (2) imposition of other penalties and sanctions; and (3) remorse.

## II. *ISSUE*

■ The sole issue presented by this disciplinary case is whether the recommended suspension in the present case is sufficient to protect the public, the integrity of the legal profession, and the dignity of the courts.

## III. *STANDARD OF REVIEW*

As the ultimate trier of both fact and law in cases involving the discipline of attorneys, we are not bound by the findings of the Board or by its hearing committee and will independently consider all testimony and evidence in the record. In short, we

review such cases *de novo.* The Board's recommendation as to discipline is entitled to greater weight than that of the hearing committee. Thus, in this case, inasmuch as a stipulation regarding the proposed sanction was entered in lieu of a committee recommendation, the Board's recommended disposition is entitled to greater weight than that contained in the stipulation.

*Office of Disciplinary Counsel v. Lau,* 85 Hawai'i 212, 214, 941 P.2d 295, 297 (1997) (citations and internal quotation signals omitted).

## IV. *DISCUSSION*

Breiner did not ask to file a brief, as permitted by RSCH 2.7(d).[2] However, upon review of the Disciplinary Board's report and recommendation, we questioned whether the recommended sixty-day suspension sufficiently reflected the seriousness of Breiner's violation of HRPC 3.5(c), as exhibited by the conduct described above. Although not required by our rules, we accorded Breiner an opportunity to show cause as to why a six-month suspension should not be imposed. In his response to our order to show cause, Breiner argues, in substance, that his remorse and acknowledgment of wrongdoing, the absence of similar prior and subsequent misconduct, his prior history with the particular trial judge (including various attempts to disqualify her), the trial court's behavior, co-counsel's behavior, and the pressures of the trial mitigate in favor of a sixty-day suspension instead of a six-month suspension. We disagree.

■ We begin our analysis with the understanding that vigorous and zealous advocacy is a necessary component of our judicial system. Likewise, "[r]espect for and confidence in the judicial office [is] essential to the maintenance of any orderly system of jus-

---

2. RSCH 2.7(d) provides in relevant part:

Unless the Board shall dismiss the petition with any required consent of counsel, remand the petition, or conclude the matter by informal admonition or private or public reprimand, the Board shall promptly submit a report containing its findings and recommendations, together with the entire record, to the supreme court. After

the filing of such report, a copy thereof shall be served on the parties in accordance with Rule 2.11(b). The court will not entertain briefs or oral argument except: (1) within its discretion upon application of the respondent or Counsel (submitted within 10 days after service of the Board's report); or (2) upon request of the court....

tice." *In re Vincenti*, 92 N.J. 591, 458 A.2d 1268, 1275 (N.J.1983). We note that the propriety of the trial court's behavior in the *Fukusaku* case is not at issue here.[3]

We stated over twenty-five years ago that

[i]t cannot be overly emphasized that it is essential for the maintenance of justice that the bar be courageous and free from intimidation and that it is equally important to our judicial system that a judge be just, firm and effective in maintaining order in his court.

. . . .

It is very important under our judicial system that a lawyer's presentation of his client's case strenuously and persistently should not be deemed a contempt of court so long as the lawyer does not in some way create an obstruction which blocks the judge's performance of his duty. *In re McConnell*, 370 U.S. 230, 236, 82 S.Ct. 1288, 8 L.Ed.2d 434 (1962). Also though *In re McConnell* "cannot be read as an immunization for all conduct undertaken by an attorney in good faith representation of his client, it does require that attorneys be given great latitude in the area of vigorous advocacy. Appellate courts must ensure that trial judges . . . are not left free to manipulate the balance between vigorous advocacy and obstructions so as to chill effective advocacy when deciding lawyer contempts." *In re Dellinger*, 461 F.2d 389, 398 (7th Cir.1972).

Under our judicial system "it is the lawyer's duty to make his objections and other points in his client's behalf, [and] it must follow that he is entitled to a timely opportunity to make them. From this it necessarily follows that the judge is without power to foreclose that opportunity by any order or admonition to sit down or to be quiet or not to address the court. The

power to silence an attorney does not begin until reasonable opportunity for appropriate objection or other indicated advocacy has been afforded." *Cooper v. Superior Court*, 55 Cal.2d 291, 10 Cal.Rptr. 842, 359 P.2d 274, 278 (Cal.1961). *Edmunds v. Chang*, 54 Haw. 568, 570–571, 512 P.2d 3, 5 (1973) (some ellipsis points in original and some added) (brackets in original).

■ Nevertheless, we have made it clear that when an attorney's in-court conduct and statements are deliberately and flagrantly contemptuous of the court, the trial judge has the discretion to proceed summarily and find the attorney guilty of criminal contempt of court, as a petty misdemeanor, in violation of Hawai'i Revised Statutes (HRS) § 710–1077(1)(a), if such a course is necessary to ensure the orderly administration of justice. *See Evans v. Takao*, 74 Haw. 267, 290, 842 P.2d 255, 265–266 (1992); *In re Nam*, 65 Haw. 119, 648 P.2d 1101 (1982). Likewise, we have rejected the suggestion that a lawyer's overzealous representation of his client and contemptuous behavior are one and the same. "While every counsel has the right to pursue every claim, if a ruling is unfavorable, 'it is not counsel's right to resist it or to insult the judge—[the attorney's] right is only respectfully to preserve his point for appeal.'" *Schutter v. Soong*, 76 Hawai'i 187, 208–209, 873 P.2d 66, 87–88 (1994) (citations omitted). In *Schutter*, we "refuse[d] to 'equate an attorney's contempt for the court with courage or his insults with independence and [noted that] we [would] protect the orderly processes of justice.'" *Id.* at 209, 873 P.2d at 88 (citation omitted).[4] We have also stated that when contemptuous conduct occurs "before and in the presence of the court, it violates [former] Disciplinary Rule 7–106(C)(6),"[5] *Nam*, 65 Haw. at 128, 648 P.2d at 1107, but we have not, until now,

---

3. Complaints regarding a judge's behavior are made to the Commission on Judicial Conduct, pursuant to RSCH 8.

4. We did not receive a report and recommendation for discipline in connection with the events arising from *Schutter*.

5. HRPC 3.5(c) was derived from former Disciplinary Rule 7–106(C)(6). 1 GEOFFREY C. HAZARD,

JR. AND W. WILLIAM HODES, *THE LAW OF LAWYERING· A HANDBOOK ON THE MODEL RULES OF PROFESSIONAL CONDUCT*, § 3.5:401 (2d ed.1998). Titled "Trial Conduct," Disciplinary Rule 7–106(C)(6) provided:

(C) In appearing in his professional capacity before a tribunal, a lawyer shall not:

. . .

(6) Engage in undignified or discourteous conduct which is degrading to a tribunal.

addressed contemptuous behavior in the context of a disciplinary proceeding.

■ While disciplinary proceedings may possess punitive attributes, punishment is not their purpose. Rather, the purpose of suspension or disbarment is to protect the public and to maintain the integrity of the legal profession and the dignity of the courts. *Lau,* 85 Hawai'i at 214–215, 941 P.2d at 297–298. HRPC 3.5(c) provides that "[a] lawyer shall not engage in conduct intended or reasonably likely to disrupt a tribunal." The rule is intended to enforce the standards of decorum and courtesy necessary to promote and maintain an orderly system of justice in which people can have confidence when their rights and obligations are at stake.

Courts are places for the dispassionate examination of evidence and the neutral consideration of arguments regarding the requirements of the law. They are our society's alternative to the brute force of the police state, the street brawl, and the violence of a domestic dispute. When we speak of maintaining the integrity of the legal profession and the dignity of the courts, we do not intend that attorneys be reduced to obsequious sycophants in order to avoid offending the fragile sensibilities of judges. To the contrary, we merely require that the members of a learned profession, who are privileged to serve as officers of the court, act in accordance with the time-honored traditions that experience has taught us are necessary to protect the office of the court and the process of justice from devolving into the barroom brawl. We are, in sum, demanding a degree of civility sufficient to gain and maintain respect for the institution of the courts and the rule of law so that people need not feel that they must resort to brute force, mob action, street brawls, or domestic disturbances in order to seek and obtain justice. The New Jersey Supreme Court, discussing former Disciplinary Rule 7–106(C)(6), characterized the need for requiring civil behavior as follows:

> The prohibition of our Disciplinary Rules against "undignified or discourteous conduct * * * degrading to a tribunal" . . . is not for the sake of the presiding judge but for the sake of the office he or she

holds. Respect for and confidence in the judicial office are essential to the maintenance of any orderly system of justice. This is not to suggest that a lawyer should be other than vigorous, even persistent in the presentation of a case, nor is it to overlook the reciprocal responsibility of courtesy and respect that the judge owes to the lawyer. Unless these respective obligations are scrupulously honored, a trial court will be inhibited in performing two essential tasks: sifting through conflicting versions of the facts to discover where truth lies, and applying the correct legal principles to the facts as found. Under the best of circumstances these tasks are difficult; without an orderly environment they can be rendered impossible.

> Unless order is maintained in the courtroom and disruption prevented, reason cannot prevail and constitutional rights to liberty, freedom and equality under the law cannot be protected. The dignity, decorum and courtesy [that] have traditionally characterized the courts of civilized nations are not empty formalities. They are essential to an atmosphere in which justice can be done [*Code of Trial Conduct* § 17 (American college of Trial Lawyers 1983).]

*Vincenti,* 458 A.2d at 1275.

■ HRPC 3.5(c) is identical to the Model Rule from which it was adopted and carries with it the option of a disciplinary sanction as a supplement to the traditional power of judges to punish disruptive behavior as contempt of court. 1 GEOFFREY C. HAZARD, JR. AND W. WILLIAM HODES, *THE LAW OF LAWYERING: A HANDBOOK ON THE MODEL RULES OF PROFESSIONAL CONDUCT,* § 3.5:401 (2d ed.1998); *See also In re Trask,* 46 Haw. 404, 423, 380 P.2d 751, 761 (1963) ("While the purpose of disciplinary proceedings is primarily for the protection of the public and the bar and not for punishment of the offending attorney, the element of punishment and the necessity of determining the extent thereof is inevitably present whenever disciplinary action against an attorney is warranted." (Citations omitted.)).

When we promulgated HRPC 3.5(c), we approved the following comment:

The advocate's function is to present evidence and argument so that the cause may be decided according to law. Refraining from abusive or obstreperous conduct is a corollary of the advocate's right to speak on behalf of litigants. A lawyer may stand firm against abuse by a judge but should avoid reciprocation; the judge's default is no justification for similar dereliction by an advocate. An advocate can present the cause, protect the record for subsequent review, and preserve professional integrity by patient firmness no less effectively than by belligerence or theatrics.

HRPC 3.5 Comment [2]. In short, Rule 3.5(c) states a clear policy requiring attorneys to act in a civil manner while pursuing the interests of their clients.

Commentators have noted the balancing necessary to address allegations of Rule 3.5(c) violations:

When a lawyer is pitted against an abusive judge, who is also harming the lawyer's client with his [or her] rulings, the lawyer faces a dilemma. If he [or she] responds in an obstreperous manner, the controversy may escalate, and the proceedings will indeed be interrupted. That the judge committed the first infraction would not excuse the lawyer's conduct, although it might later mitigate the sanction. On the other hand, a lawyer should not be so concerned with pleasing a judge as to leave his client's rights unprotected. The lawyer must have the courage to stand respectfully firm long enough to insist that a record be made for appellate scrutiny.

Even if a judge's order is clearly improper, the lawyer should obey it and then seek review. . . . Temporary disobedience might be justified in a rare case where the judge attempts to prohibit even the making of a record, or in which even temporary compliance would result in irreparable harm to a client. In such a case it could be said that the lawyer has not "intended" to disrupt the tribunal at all, but has attempted to insure that the overall course of the litigation will proceed *more* smoothly, not less. Such a lawyer would not be liable for a disciplinary infraction, but would probably be found in contempt of court, and could then pursue his remedies through a "test-case" appeal.

1 GEOFFREY C. HAZARD, JR. AND W. WILLIAM HODES, *THE LAW OF LAWYERING: A HANDBOOK ON THE MODEL RULES OF PROFESSIONAL CONDUCT*, § 3.5:401 (2d ed.1998).

■ Breiner apparently believed that he was the object of abuse at the hands of the trial court. Such a belief, however, would not and could not serve as a justification for his abusive and obstreperous conduct because "such conduct is no justification for similar dereliction by an advocate." *Id.* In considering the importance of zealous advocacy, the orderly administration of justice, and the maintenance of the integrity of the legal profession and the dignity of the courts, other jurisdictions have reached varying disciplinary results depending upon the circumstances with which they were faced.[6] Our

6. For example, the New Jersey Supreme Court suspended an attorney for one year on a twenty-two count ethics complaint for in-court and out-of-court misconduct in two cases. The court summarized the respondent's in-court misconduct as "frequently sarcastic, disrespectful and irrational" and noted that the respondent "accused the court on numerous occasions of, *inter alia,* collusion with the prosecution, cronyism, racism, permitting the proceedings to have a 'carnival nature', conducting a kangaroo court, prejudging the case, conducting a 'cockamamie charade of witnesses' and barring defense counsel from effectively participating in the proceedings, conducting a sham hearing, acting outside the law, being caught up in his 'own little dream world', and ex-parte communications with the prosecutor together with other equally outrageous, disrespectful and unsupported charges."

*In re Vincenti,* 458 A.2d at 1269. The New Jersey court decided *Vincenti* under disciplinary rules similar to our previous Disciplinary Rules. The New Jersey court's comment regarding appropriate courtroom conduct is nonetheless instructive:

. . . [R]espondent was guilty of behavioral delinquencies transcending any notion of decent advocacy. . . . That Respondent would seek to justify his conduct on the basis of forceful and zealous representation of his client simply underscores his flawed perception of a lawyer's obligation to the court, to other attorneys, and to witnesses as set forth in the various Disciplinary Rules[.]

*Id.* at 1274. Unlike Vincenti, Breiner acknowledges his wrongdoing and ethical violations.

The North Carolina Court of Appeals affirmed a judgment of contempt and a disbarment in *In*

duty here is to impose an appropriate sanction. The *American Bar Association [ABA] Standards for Imposing Lawyer Sanctions* (1986) are a useful reference when determining disciplinary sanctions, *Office of Disciplinary Counsel v. Lau,* 79 Hawai'i 201, 206, 900 P.2d 777, 782 (1995) (citing *Office of Disciplinary Counsel v. Rapp,* 70 Haw. 539, 544, 777 P.2d 710, 714 (1989)). Standard 6.22 notes that "[s]uspension is appropriate when a lawyer knows that he is violating a court order or rule, and there is injury or potential injury to a client or a party, or interference or potential interference with a legal proceeding." *ABA Standards for Imposing Lawyer Discipline,* Standard 6.22 (1986). We have no doubt that Breiner's behavior during the *Fukusaku* trial interfered with the proceedings. Breiner could simply have preserved issues regarding the conduct of the trial by voicing his objections on the record and moving on. Instead, he elected to argue with the trial court and comment on and defy its rulings. Breiner's behavior was at the very least obstreperous and, in fact, resulted in his conviction of four counts of criminal contempt of court. At a minimum, Breiner's behavior prolonged Mr. Fukusaku's trial and resulted in the prosecution and Mr. Fukusaku's subsequent counsel having to expend considerable time on appeal addressing the effect of Breiner's exchanges with the trial court. *See, Fukusaku,* 85 Hawai'i at 483–485, 946 P.2d at 51–53.

The length of a suspension should reflect, among other things, the seriousness of a lawyer's misconduct. *Disciplinary Board of Hawaii Supreme Court v. Bergan,* 60 Haw. 546, 555, 592 P.2d 814, 819 (1979) ("While this court is of the opinion that the committee's recommendation for a three-year suspension does not adequately reflect the seriousness of the respondent's misconduct, we also believe, however, that a suspension of sufficient length would equally serve our purpose as would disbarment."). We agree with the parties that Breiner's prior discipline, his pattern of misconduct and multiple offenses, and his substantial experience in the practice of law aggravate the seriousness of his misconduct. We also note that Breiner's prior informal admonition included a recommendation that he "seek assistance from the Professional Responsibility Committee of the Hawai'i State Bar Association regarding civility." On the other hand, we likewise agree with the parties that Breiner's cooperative attitude toward the disciplinary proceedings and his expression of remorse mitigate, to some extent, the magnitude of the sanction to be imposed, but note that cooperation in disciplinary proceedings is required by our rules under any circumstances, and we expect cooperation from every attorney involved in disciplinary proceedings. *See* RSCH 2.12A.

## V. *CONCLUSION*

A disciplinary sanction must reflect the serious nature of the harm caused the orderly administration of justice by the attorney's behavior. Breiner's contemptuous behavior

---

*re Paul,* 84 N.C.App. 491, 353 S.E.2d 254 (N.C.Ct.App.), *cert. denied,* 319 N.C. 673, 356 S.E.2d 779 (N.C.1987), and *cert. denied, Paul v. North Carolina,* 484 U.S. 1004, 108 S.Ct. 694, 98 L.Ed.2d 646 (1988). Paul, the disbarred attorney, had solicited a friend of Paul's client to disrupt the court during the client's criminal trial. The disrupter stood up in open court after the trial judge sustained an objection and said, "Judge, please give this man a chance to represent his client. You [sic] acting like a D.A."
    The South Carolina Supreme Court disbarred an attorney convicted of contempt. The contempt conviction resulted from the attorney's communication with a juror in a case in which the attorney represented a defendant. Characterizing the communication as a "serious crime" under South Carolina law, the South Carolina Supreme Court rejected its grievance committee's recommendation of an indefinite suspension

and disbarred the attorney. *In re Holman,* 277 S.C. 293, 286 S.E.2d 148 (S.C.1982).
    The Minnesota Supreme Court disbarred the aptly named Luther Paulsrude because Paulsrude pronounced the judge a "horse's ass" and suggested that the judge presided over a "Kangaroo Court." Paulsrude also (1) drafted a usurious promissory note for a client, (2) threatened a witness who was scheduled to appear against him, (3) did not file a complaint on behalf of a client despite having represented otherwise, and (4) committed several other infractions in civil proceedings. The Minnesota disciplinary board pointed out that Paulsrude was unlikely to mend his ways. *Matter of Paulsrude,* 311 Minn. 303, 248 N.W.2d 747 (Minn.1976). *Cf. In re Daly,* 291 Minn. 488, 189 N.W.2d 176 (Minn.1971) (wilful disobedience to single court order may alone justify disbarment).

undoubtedly denigrated the legal profession and the dignity of the courts. A suspension of less than six months would be insufficient to express the extent of our concern that the public, the legal profession, and the courts be protected from such unprofessional conduct. Therefore, an order suspending Breiner from the practice of law for a period of six months will be entered contemporaneously with the filing of this opinion.