113 P.3d 203

**OFFICE OF DISCIPLINARY COUNSEL, Petitioner,**

v.

**Ronald G.S. AU, Respondent.**

**No. 26517.**

Supreme Court of Hawai'i.

June 7, 2005.

Reconsideration Denied July 1, 2005.

Alvin T. Ito, special assistant disciplinary counsel, for petitioner.

Ronald G.S. Au, respondent, pro se.

MOON, C.J., LEVINSON and NAKAYAMA, JJ., Circuit Judge CRANDALL, In Place of ACOBA, J., Recused, and Circuit Judge WONG, In Place of DUFFY, J., Recused.

PER CURIAM.

The Disciplinary Board (the Board) filed a report and recommendation to suspend Respondent Ronald G.S. Au (Au) from the practice of law for a period of two years. The Board bases its report and recommendation on a hearing committee's findings of fact and conclusions of law.

We accept the hearing committee's findings of fact and conclusions of law. For the reasons set forth below, however, we suspend Au from the practice of law for a period of five years. A separate suspension order is entered with this opinion.

## I. BACKGROUND

### A. The ODC's Petition for Discipline

On November 14, 2000, Petitioner Office of Disciplinary Counsel (the ODC) petitioned the Board to recommend sanctions against Au based on alleged violations of the Hawai'i Rules of Professional Conduct (HRPC) in three separate disciplinary matters.

#### 1. ODC 95–242–4701

The ODC alleged that, in the course of representing a client before the Circuit Court of the First Circuit, State of Hawai'i, Au drafted and filed two documents that cited to *Sherry v. Ross,* 846 F.Supp. 1424 (D.Haw. 1994) (*Sherry* ). Au made the following rep-

resentations to Circuit Court Judge Daniel G. Heely:

- that *Sherry* was decided on the "attorney-client crime-fraud provisions [of Rule 503 of the Hawai'i Rules of Evidence (HRE) ] and the Fraudulent Conveyance Act ... [under] HRS 651 C–4";
- that, in *Sherry,* the debtor conveyed real property to his wife with the help of an attorney who prepared the conveyance;
- that the United States Court of Appeals for the Ninth Circuit upheld the "Federal Court"; and
- that the "Court [presumably the Ninth Circuit] found that fraudulent intent was not proven under the fraudulent conveyances provision as under the common law provision."

In fact, Au's description of *Sherry* was not accurate because

- *Sherry* addresses neither the attorney-client privilege nor the "crime-fraud" exception to the attorney-client privilege;
- *Sherry* does not mention a relationship between an attorney and a client, nor does it mention an attorney or an attorney assisting in a conveyance;
- *Sherry* was decided under neither the "Fraudulent Conveyance Act" nor the "Uniform Fraudulent Transfer Act," but rather, *Sherry* was decided under the common law;
- in *Sherry,* a third party (not the debtor) conveyed property to a debtor's wife, and a subsequent creditor challenged the conveyance; and
- Magistrate Judge Francis I. Yamashita of the United States District Court for the District of Hawaii authored *Sherry,* and there was no Ninth Circuit opinion.

The circuit court judge and opposing counsel complained separately to the ODC about Au's misconduct.

### 2. *ODC 97–213–5407*

The ODC alleged that, with respect to several different clients, Au committed the following misconduct:

- improperly deposited his clients' settlement proceeds into his office account;
- improperly paid costs from his client trust account;
- improperly deposited unearned fees into his office account;
- improperly reimbursed his trust account;
- failed to withdraw funds from his client trust account;
- improperly deposited clients' settlement proceeds into his office account;
- falsely certified in his annual registration statements for the Hawai'i State Bar Association (HSBA) that he was maintaining clients' funds and property in compliance with HRPC Rule 1.15; and
- paid fees to a non-lawyer runner in exchange for the non-lawyer runner's referral of clients for legal services to Au.

### 3. *ODC 98–064–5555*

The ODC alleged that, with respect to a particular client, Au improperly deposited unearned fees into his office account.

### B. *Au's Answer*

On December 18, 2000, Au answered the ODC's petition for discipline. On March 19, 2002, Au filed a first amended answer to the ODC's petition for discipline.

### C. *The Hearing Committee*

On September 28, 2001, the Board appointed three persons to serve as the hearing committee for the ODC's petition against Au: (1) attorney Paul Alston (Chairperson Alston) as the chairperson of the hearing committee; (2) attorney Christobel Kealoha, as a member; and (3) Terri Needles, Ph.D., as a member. During the next year, the parties conducted discovery under the supervision of the hearing committee. The hearing committee held pre-hearing conferences to address disputes and controversies regarding evidence that the parties intended to introduce.

. For example, one controversy involved the ODC's allegations that a non-lawyer, Wayne Yoshimoto (Yoshimoto), had an agreement with Au under which Yoshimoto found legal clients and referred them to Au in exchange for Au's payment of five percent of the gross

amount of any settlement that Au recovered for the clients. The ODC intended to prove the allegations by introducing copies of some of Au's checks to Yoshimoto, settlement statements, witness testimony, as well as some audiotapes and corresponding transcripts from some of Yoshimoto's conversations with Au that Yoshimoto surreptitiously recorded on August 16 and 29, 1994. Yoshimoto recorded the conversations with Au because Au was allegedly not paying Yoshimoto some of the client referral fees that Au owed to Yoshimoto, and Yoshimoto wanted to obtain proof that Au acknowledged the existence of their agreement for client referral fees. Au contested the authenticity of Yoshimoto's tape recordings and corresponding transcripts. Au also claimed that someone had deleted exculpatory statements from Yoshimoto's tape recordings. Consequently, on October 24, 2002, the hearing committee issued a pre-hearing order that provided, among other things, that, by November 17, 2002, Au could submit to the hearing committee an annotated copy of the transcripts that would show: (1) the portions of the transcripts that Au accepted as accurate; (2) the portions of the transcripts that Au contended were audible but incompletely or inaccurately transcribed, as well as Au's suggested changes to remedy the incompleteness or inaccuracy; and (3) the portions of the transcripts that Au contended were inaudible and therefore inaccurately transcribed. However, Au did not submit an annotated copy of the transcripts to the hearing committee.

### D. *Formal Evidentiary Hearings*

The hearing committee held formal evidentiary hearings on January 21, January 22, and April 29, 2003. At these hearings, the ODC adduced substantial evidence in support of the ODC's various allegations relating to Au's misrepresenting the holding of a published case, mishandling client funds, misusing a client trust account, and paying a non-lawyer "runner" a fee in exchange for client referrals.

The ODC's evidence included, among other things, Yoshimoto's testimony that he had an agreement with Au under which Yoshimoto found and referred several legal clients to Au

in exchange for Au's payment of five percent of the gross amount of any settlement that Au recovered for the clients. The ODC also adduced copies of some of Au's checks to Yoshimoto for his referral fees, Au's settlement statements, as well as the audiotapes and corresponding transcripts from the conversations with Au that Yoshimoto surreptitiously recorded on August 16 and 29, 1994.

One of the clients whom Yoshimoto referred to Au was Cindy Labrador (Labrador). Labrador had two personal injury matters. Au eventually settled Labrador's two personal injury matters for (1) $27,000.00 and (2) $19,000.00, or a total settlement amount of $46,000.00. At about the time when Au settled the second of Labrador's two personal injury matters, Au gave Yoshimoto a check for only $500.00. Yoshimoto learned from Labrador that Au had settled the two personal injury matters for a total amount of $46,000.00. Consequently Yoshimoto met with Au on August 16 and 29, 1994, for the purpose of discussing various unpaid fees that Au owed Yoshimoto, including Yoshimoto's five percent fee for Labrador's two personal injury matters. Following the discussions, Au wrote Yoshimoto two checks, dated August 29, 1994, in the amounts of $850.00 and $950.00. Although writing on the two checks purported that the checks were payments for Yoshimoto's "investigative services" in Labrador's personal injury matters, Au's three payments (i.e., $500.00, $850.00 and $950.00) to Yoshimoto for his services in Labrador's two personal injury matters added up to $2,300.00, which was exactly five percent of the $46,000.00 settlement amount.

In contrast to the ODC's evidence, Au testified, among other things, that Au did not have an agreement with Yoshimoto to pay Yoshimoto a fee in exchange for client referrals. For example, Au claimed that he paid Yoshimoto in Labrador's two personal injury matters because Yoshimoto had performed investigative services.

At the conclusion of the evidentiary hearing on April 29, 2003, Chairperson Alston told the ODC and Au to submit their proposed findings of fact and conclusions of law to the hearing committee.

However, on October 28, 2003, Chairperson Alston ordered the parties to appear at a newly scheduled hearing on October 31, 2003. Chairperson Alston informed the parties that the hearing committee would address the following two issues at the October 31, 2003 hearing:

> If the Panel determines that the Respondent [Au] has given false testimony and/or made frivolous arguments and/or made groundless accusations against witnesses, to what extent may the Panel consider such matters in deciding (1) the Respondent [Au]'s guilt; and (2) the appropriate discipline, if any[?]

Chairperson Alston began the October 31, 2003 hearing by informing Au that the hearing committee members believed Au's prior testimony was not truthful, and that Au had an improper client referral agreement with Yoshimoto:

> THE CHAIRMAN: We have convened this morning to do one thing, Mr. Au, and that is to listen to portions of the audiotape, and to get your comment on what we hear in those audiotapes. I will tell you that, as we sit here this morning, *it's the unanimous view of the Panel that, in fact, you have not testified truthfully* today. I think *it is the unanimous view of the Panel,* subject to the outcome of today's proceeding, *that, in fact, you had an agreement with Mr. Yoshimoto.* And before we make our decisions based on those view, I wanted to give you—the Panel wanted to give you an opportunity to speak directly to the content of the tape because there has been a lot of paper and a lot of argument about the accuracy of the transcript, and the content of the tape, but *what we hear in your own words appears to be very damning to you.* We wanted to hear you speak directly to those matters. All right?

(Emphases added.) In response to Chairperson Alston's opening statement, Au asserted, once again, that he did not have an agreement with Yoshimoto to pay Yoshimoto in exchange for client referrals. Near the conclusion of the hearing, Chairperson Alston indicated to Au that the hearing committee did not believe Au's testimony:

> THE CHAIRMAN: Mr. Au, I'm going to give you one final opportunity—
>
> MR. AU: To comment.
>
> THE CHAIRMAN: No. To consider recanting your testimony today and the position you've taken in this hearing about whether there was an agreement with this fellow to pay him referral fees.

Nevertheless, Au denied that he paid client referral fees to Yoshimoto.

### E. Au's Motion for the Recusal or Disqualification of Chairperson Alston

Six days later, on November 6, 2003, Au moved the hearing committee for the recusal or disqualification of Chairperson Alston and the designation of a new panel of members for the hearing committee. Au asserted that Chairperson Alston's and Au's pecuniary interests in two disputes created conflicts of interest that required Chairperson Alston's recusal or disqualification under Canons 2 and 3(E) of the Code of Judicial Conduct.

#### 1. The Alteka Matter

The first purported conflict of interest involved a dispute between Au and Chairperson Alston's law firm, Alston, Hunt, Floyd & Ing (AHFI), over the apportionment of an award of $176,287.80 in attorneys' fees that Alteka Co., Ltd. (Alteka), won in an appeal entitled *Shanghai Investment Company, Inc., v. Alteka Co., Ltd.,* 92 Hawai'i 482, 993 P.2d 516 (2000) [1] (hereinafter referred to as "the Alteka Matter"). The Alteka Matter involved two consolidated cases and multimillion-dollar contract claims:

---

1. In *Shanghai Investment Company, Inc., v. Alteka Co., Ltd.,* 92 Hawai'i 482, 993 P.2d 516 (2000), Au did not succeed in obtaining an award of attorneys' fees and costs for Alteka while the case was pending before the trial court. Chairperson Alston took over the representation of Alteka for the subsequent appeal, in which Chairperson Alston succeeded in obtaining an award of attorneys' fees and costs for Alteka. *See Shanghai Investment Company, Inc., v. Alteka Co., Ltd.,* 92 Hawai'i at 502, 993 P.2d at 536 ("The trial court erred, however, in denying Alteka's request for attorneys' fees and costs inasmuch as Alteka was, on balance, the 'prevailing party' in the case.").

(a) Alteka and Shanghai Investment Company, Inc. (Shanghai), in *Shanghai Investment Company, Inc. v. Alteka Co., Ltd.*, Civil No. 94–2683–07; and

(b) Alteka and Windward Park, Inc. (Windward), in *Alteka Co., Ltd. v. Windward Park, Inc., et al.*, Civil No. 95–3483–09.

Au represented Alteka in these consolidated cases while they were pending before a trial court. According to Au, he had a contingent fee agreement with Alteka. Alteka prevailed in some, but not all, of the disputed claims. For example, although the trial court awarded Alteka $1,171,949.76 on Alteka's breach of contract claim against Windward, the trial court awarded Windward $5,000,000.00 on Windward's breach of contract counterclaim against Alteka. *See Shanghai Investment Company, Inc., v. Alteka Co., Ltd.*, 92 Hawai'i at 491, 993 P.2d at 525. Furthermore, the trial court denied Alteka's motion for an award of attorneys' fees, even though Alteka successfully defended itself against all of Shanghai's claims. *Id.* Although Alteka intended to appeal from the judgment, Au withdrew as Alteka's counsel, and Chairperson Alston and his law firm, AHFI, appeared as Alteka's substitute counsel. On behalf of Alteka, Chairperson Alston and AHFI appealed to this court. On appeal, Chairperson Alston and AHFI succeeded in convincing us

> that the trial court erred in (1) awarding Windward $5 million in damages against Alteka; and (2) denying Alteka's request for attorney fees and costs in successfully defending against the claims made by Shanghai.... We therefore vacate the $5 million damage award to Windward and remand to the trial court with instructions to (1) enter judgment in favor [of] Alteka for $1,171,949.76 plus interest and (2) determine and *award reasonable attorneys' fees to Alteka against Windward and Shanghai* in accordance with this opinion....

*Shanghai Investment Company, Inc., v. Alteka Co., Ltd.*, 92 Hawai'i at 505, 993 P.2d at 539 (emphasis added). Because Alteka prevailed in the appeal, we awarded attorneys' fees in the amount of $176,287.80 to Alteka:

> Upon careful consideration of Defendant–Appellant Alteka Co., Ltd.'s First Request for Attorneys' fees, the papers in support and opposition, and the records and files in this case,
>
> IT IS HEREBY ORDERED that the motion is granted in part, and attorneys' fees totaling $176,287.80 are approved and *awarded to Alteka.* Said sum shall be imposed against Shanghai Investment Company, Inc. and Windward Park, Inc., jointly and severally.

(Emphasis added.)

Although Au had withdrawn as Alteka's counsel prior to the appeal, Au believed that he was entitled to a portion of Alteka's award of attorneys' fees pursuant to Au's contingent fee agreement with Alteka. Based on Alteka's refusal to give Au a portion of the award of attorneys' fees, Au asserted that he had a financial dispute with Chairperson Alston that warranted Chairperson Alston's disqualification in the ODC's disciplinary proceedings.

In an attempt to show the hearing committee the alleged dispute between Au and Chairperson Alston, Au submitted, among other things, a photocopy of a letter that Au had written to Alston more than three and one-half years earlier, dated March 29, 2000, in which Au threatened to impose a lien on Alteka's award of attorneys' fees resulting from Alteka's successful appeal:

> Dear Mr. Alston:
>
> Have you had an opportunity to discuss our claims for attorney's fees in the Shanghai case[?] I am certainly open to any reasonable arrangement. *If we cannot reach an agreement by Friday, March 31, 2000, I am compelled to file an attorney's lien on the case.* I appreciate your personal efforts.
>
> May I hear from you[?]
>
> > Sincerely,
> >
> > [Signature]
> >
> > RONALD G.S. AU

(Emphasis added.) Au additionally submitted a letter from Chairperson Alston to Au, also dated March 29, 2000. In the March 29, 2000 letter, Chairperson Alston stated, on

behalf of Alteka, (1) that the attorney-client agreement between Au and Alteka did not entitle Au to receive any additional attorneys' fees from Alteka and (2) that Au's mistakes as Alteka's trial counsel contributed to the trial court's initial judgment against Alteka:

Dear Mr. Au:

I have received your letter dated March 29[, 2000]. I still have not received any decision from Alteka about your demands, so I cannot promise it will be possible to reach any agreement by the end of the month (two days from now).

In any event, *you are not now owed any money based upon my reading of the agreements,* so I am not sure what causes your sense of urgency. In addition, *there are troublesome questions about how the failure timely to raise the penalty/liquidated damages issue in the trial court contributed to (1) the judgment against Alteka, and (2) the cost of the appeal.* I do not think it is in your interest to provoke discussion of those issues.

I will follow up with Mr. Matsumura tomorrow and report to you as soon as possible on the progress Alteka is making toward making a decision on your demands.

PAUL ALSTON

(Emphases added.)

Despite the three-year delay between (1) the commencement of the purported conflict between Chairperson Alston and Au in the Alteka Matter and (2) Au's motion to disqualify Chairperson Alston in the disciplinary proceedings, Au explained that he did not raise the issue of Chairperson Alston's alleged conflict prior to, or during, the disciplinary hearings "because Respondent [Au] had the highest degree of respect for the integrity and impartiality of ALSTON[.]"

#### 2. *The Kida Matter*

The second purported conflict of interest arose out of Au's August 2003 appearance on behalf of a client, Gary Shigemura, in a foreclosure action in which both Shigemura and AHFI's client, Beneficial Hawaii, Inc. (Beneficial), foreclosed on their respective mortgages against the same debtor, Donald Kida,

and, inevitably, Shigemura and Beneficial disputed the priority of their respective mortgages (hereinafter referred to as "the Kida Matter"). The Kida Matter arose out of two consolidated cases:

(a) *Donald M. Kida v. Michele Kobayashi, et al.,* Civil No. 97–4838–11, and

(b) *Beneficial Hawaii, Inc. v. Donald Mueno Kida, et al.,* Civil No. 01–1–2275–08.

Au did not initially represent any of the parties in the Kida Matter. For example, while the hearing committee was conducting the disciplinary hearings regarding Au on January 21, January 22, and April 29, 2003, Au was not yet involved in the Kida Matter.

However, in August 2003, Au began appearing as legal counsel for Shigemura in the Kida Matter. At that time, the circuit court required Shigemura to hire an attorney because, after Shigemura had rendered several years of legal services on Kida's behalf, Kida had allowed Shigemura to obtain a second mortgage on Kida's real property in an amount equivalent to the attorney's fees that Kida owed Shigemura. Beneficial held the first mortgage on Kida's real property. When Shigemura's mortgage became an issue in the Kida Matter, the circuit court required Shigemura to hire an attorney to advocate on behalf of Shigemura's mortgage interest.

On September 15, 2003, Au moved the circuit court (on Shigemura's behalf) to disqualify Chairperson Alston's law firm, AHFI, from representing Beneficial in the Kida Matter. Kida joined the motion. The circuit court denied Au's motion to disqualify AHFI and ordered the parties in the case to participate in mediation prior to trial. The mediation concluded with the parties agreeing to settle the litigation.

#### 3. *The Adjudication of Au's Motion to Disqualify Chairperson Alston*

On November 26, 2003, the hearing committee denied Au's motion for the recusal or disqualification of Chairperson Alston.

F. *The Hearing Committee's Findings of Fact, Conclusions of Law, and Recommendation*

On November 26, 2003, the hearing committee also filed its forty-seven-page findings of fact, conclusions of law, and recommendation for discipline. The hearing committee found, among other things, that Au falsely testified

- that Au first paid his clients and then deposited the clients' settlement checks into Au's office account,
- that Au had no client referral agreement with Yoshimoto, and
- that the fees Au paid Yoshimoto for Labrador's two personal injury matters were for Yoshimoto's investigative services.

The hearing committee further found that, instead of testifying truthfully, Au attempted to mislead and deceive the ODC and the hearing committee regarding his dealings with Yoshimoto. When the hearing committee gave Au opportunities to recant his false testimony, Au refused. The hearing committee concluded that Au violated the HRPC as follows:

1. *ODC 95–242–4701*

With respect to ODC 95–242–4701, the hearing committee concluded that Au misrepresented the holding of a published court opinion, *Sherry v. Ross*, 846 F.Supp. 1424 (D.Haw.1994), to Judge Heely in violation of:

- HRPC Rule 1.1 (requiring a lawyer to provide competent representation);
- HRPC Rule 3.3(a)(1) (prohibiting a lawyer from knowingly making a false statement of material fact or law to a tribunal); and
- HRPC Rule 8.4(c) (prohibiting a lawyer from engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation).

2. *ODC 97–213–5407*

With respect to ODC 97–213–5407, the hearing committee concluded that, in several instances, Au improperly deposited his clients' settlement proceeds into his office account in violation of:

- HRPC Rule 1.15(a)(1) (requiring a lawyer to maintain a client trust account into which the lawyer must deposit all funds that are entrusted to the lawyer's care);
- HRPC Rule 1.15(c) (prohibiting a lawyer from commingling client funds with the lawyer's own funds or misappropriating such funds for the lawyer's own use or benefit);
- HRPC Rule 1.15(c) (requiring a lawyer to deposit into a client trust account any funds that belong in part to a client and in part presently or potentially to the lawyer); and
- HRPC Rule 1.15(d) (requiring a lawyer to deposit intact into a client trust account all funds entrusted to the lawyer except for non-refundable retainers earned upon receipt).[2]

The hearing committee concluded that, in several instances, Au paid for certain litigation costs by using funds from his client trust account in violation of:

- HRPC Rule 1.15(a)(1) (requiring a lawyer to maintain a client trust account into which the lawyer must deposit all funds that are entrusted to the lawyer's care);
- HRPC Rule 1.15(c) (prohibiting a lawyer from commingling client funds with the lawyer's own funds);
- HRPC Rule 1.15(c) (requiring a lawyer to deposit into a client trust account any funds that belong in part to a client and in part presently or potentially to the lawyer, but additionally requiring the lawyer to withdraw any portion belonging to the lawyer when due); and
- HRPC Rule 1.15(e) (requiring that, when a lawyer withdraws earned fees from a client trust account, the lawyer must distribute the earned fees by check to the named lawyer).

The hearing committee concluded that Au improperly deposited unearned fees into his

---

**2.** Effective January 1, 2002, we amended HRPC Rule 1.15(d) by, among other things, deleting the reference to "non-refundable retainers" and providing that "all fee retainers are refundable until earned." HRPC Rule 1.15(d) (as amended on October 9, 2001, effective January 1, 2002).

office account, rather than his client trust account, in violation of:

- HRPC Rule 1.15(a)(1) (requiring a lawyer to maintain a client trust account into which the lawyer must deposit all funds that are entrusted to the lawyer's care);
- HRPC Rule 1.15(c) (prohibiting a lawyer from commingling client funds with the lawyer's own funds or misappropriating such funds for the lawyer's own use or benefit);
- HRPC Rule 1.15(c) (requiring a lawyer to deposit into a client trust account any funds that belong in part to a client and in part presently or potentially to the lawyer); and
- HRPC Rule 1.15(d) (requiring a lawyer to deposit intact into a client trust account all funds entrusted to the lawyer except for non-refundable retainers earned upon receipt).[3]

The hearing committee concluded that Au improperly reimbursed his client trust account in violation of:

- HRPC Rule 1.15(c) (prohibiting a lawyer from commingling client funds with the lawyer's own funds);
- HRPC Rule 1.15(c) (requiring a lawyer to deposit into a client trust account any funds that belong in part to a client and in part presently or potentially to the lawyer, but additionally requiring the lawyer to withdraw any portion belonging to the lawyer when due); and
- HRPC Rule 1.15(e) (requiring that, when a lawyer withdraws earned fees from a client trust account, the lawyer must distribute the earned fees by check to the named lawyer).

The hearing committee concluded that Au failed to withdraw funds from his client trust account in violation of:

- HRPC Rule 1.15(c) (prohibiting a lawyer from commingling client funds with the lawyer's own funds);
- HRPC Rule 1.15(c) (requiring a lawyer to deposit into a client trust account any funds that belong in part to a client and in part presently or potentially to the lawyer, but additionally requiring the

lawyer to withdraw any portion belonging to the lawyer when due); and

- HRPC Rule 1.15(e) (requiring that, when a lawyer withdraws earned fees from a client trust account, the lawyer must distribute the earned fees by check to the named lawyer).

The hearing committee concluded that Au falsely certified that he had complied with client trust account requirements in violation of:

- HRPC Rule 8.4(a) (prohibiting a lawyer from violating or attempting to violate the HRPC); and
- HRPC Rule 8.4(c) (prohibiting a lawyer from engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation).

The hearing committee concluded that Au improperly paid fees to a non-lawyer "runner" in exchange for client referrals, and, in so doing, Au also inflated his contingency fee in violation of:

- HRPC Rule 1.5(c) (requiring that a contingent fee agreement must be in writing and must state the method by which the fee is to be determined);
- HRPC Rule 7.2(c) (prohibiting a lawyer from giving anything of value to a person for recommending the lawyer's services);
- HRPC Rule 8.4(a) (prohibiting a lawyer from violating or attempting to violate the HRPC); and
- HRPC Rule 8.4(c) (prohibiting a lawyer from engaging in conduct involving dishonesty).

### 3. *ODC 98–064–5555*

With respect to ODC 98–064–5555, the hearing committee concluded that Au deposited a client's payment for legal fees into Au's personal business account before Au earned the fees in violation of:

- HRPC Rule 1.15(a)(1) (requiring a lawyer to maintain a client trust account into which the lawyer must deposit all funds that are entrusted to the lawyer's care);

---

**3.** *See supra* note 2.

- HRPC Rule 1.15(c) (prohibiting a lawyer from commingling client funds with the lawyer's own funds or misappropriating such funds for the lawyer's own use or benefit);
- HRPC Rule 1.15(c) (requiring a lawyer to deposit into a client trust account any funds that belong in part to a client and in part presently or potentially to the lawyer); and
- HRPC Rule 1.15(d) (requiring a lawyer to deposit intact into a client trust account all funds entrusted to the lawyer except for non-refundable retainers earned upon receipt).[4]

#### 4. *The Recommendation for Discipline*

The hearing committee recommended that this court impose two forms of discipline against Au: (1) public censure for (a) all of Au's misconduct in ODC 95–242–4701 and (b) Au's mishandling of clients' funds in ODC 97–213–5407 and ODC 98–064–5555; and (2) disbarment for Au's improper use of a non-lawyer "runner" to obtain client referrals in ODC 97–213–5407.

### G. *Proceedings Before the Board*

When Au's case proceeded to the Board, Au obtained the Board's permission to file a brief regarding, among other things, his prior motion to disqualify Chairperson Alston. Au appended additional documents to his brief that showed in greater detail how Chairperson Alston and Au had disputed whether Au was entitled to any of Alteka's award of attorneys' fees.

After reviewing the evidence, the Board accepted the hearing committee's order denying Au's motion for the recusal or disqualification of Chairperson Alston from the hearing committee. The Board also accepted the hearing committee's findings of fact and conclusions of law. However, the Board rejected the hearing committee's recommendation to publicly censure and disbar Au. Instead, the Board recommended that this court suspend Au from the practice of law for two years.

4. *See supra* note 2.

## II. *STANDARD OF REVIEW*

█ As the ultimate trier of both fact and law in cases involving the discipline of attorneys, we are not bound by the findings of the Board or by its hearing committee and will independently consider all testimony and evidence in the record. In short, we review such cases de novo. The Board's recommendation as to discipline is entitled to greater weight than that of the hearing committee.

*Office of Disciplinary Counsel v. Breiner,* 89 Hawai'i 167, 171, 969 P.2d 1285, 1289 (1999) (citation and internal quotation signals omitted).

## III. *DISCUSSION*

The hearing committee did not err when it denied Au's motion for the recusal or disqualification of Chairperson Alston, and the record supports the hearing committee's findings of fact and conclusions of law. However, with respect to the discipline for Au's misconduct, we conclude that it is appropriate to suspend Au from the practice of law for five years.

### A. *The Hearing Committee Did Not Err By Denying Au's Motion for the Recusal or Disqualification of Chairperson Alston.*

█ Rule 2.5(a) of the Rules of the Supreme Court of the State of Hawai'i (RSCH) requires that "[h]earing committee members and officers shall refrain from taking part in any proceeding in which a judge, similarly situated, would be required to abstain." RSCH Rule 2.5(a). In turn, "the codes of professional responsibility and judicial conduct direct judges to avoid even the appearance of impropriety." *In re Ferguson,* 74 Haw. 394, 407, 846 P.2d 894, 900–901 (1993). For example, Canon 3(E)(1)(c) of the Hawai'i Code of Judicial Conduct (HCJC) provides that

[a] judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be ques-

tioned, including but not limited to instances where:

. . . .

(c) the judge knows that he or she, individually or as a fiduciary, or the judge's spouse, parent or child wherever residing, or any other member of the judge's family residing in the judge's household, has *an economic interest in the subject matter in controversy* or in a party to the proceeding or has any other more than de minimis interest that could be substantially affected by the proceeding[.]

HCJC Canon 3(E)(1)(c) (emphasis added). Furthermore, at the time when Au moved the hearing committee to disqualify Chairperson Alston, Hawai'i law provided that *"[n]o person shall sit as a judge in any case* in which the judge's relative by affinity or consanguinity within the third degree is counsel, or interested either as a plaintiff or defendant, or *in the issue of which the judge has*, either directly or through such relative, *any pecuniary interest*[.]" HRS § 601–7(a) (1993) (emphases added).[5] Although a mere appearance of impropriety warrants a judge's recusal, "CJC Canon 3(E)(1) limits recusal to situations where the judge's impartiality might reasonably be questioned[.]" *State v. Ross*, 89 Hawai'i 371, 380, 974 P.2d 11, 20 (1999) (internal quotation marks omitted). "[T]he test for appearance of impropriety is whether the conduct would create in reasonable minds a perception that the judge's ability to carry out judicial responsibilities with integrity, impartiality and competence is impaired[.]" *Id.* (citation and internal quotation marks omitted). Therefore, "the test for disqualification due to the appearance of impropriety is an objective one, based not on the beliefs of the petitioner or the judge, but on the assessment of a reasonable impartial onlooker apprised of all the facts." *Id.*

1. *With Respect to the Conflict of Interest Arising Out of the Alteka Matter, Au's Motion for the Recusal or Disqualification of Chairperson Alston Was Not Timely.*

▮▮▮ The record shows that Chairperson Alston's and Au's conflicting pecuniary interests in the Alteka Matter would create in reasonable minds a perception that Chairperson Alston's ability to carry out his quasi-judicial responsibilities in Au's disciplinary proceedings with integrity, impartiality, and competence was impaired. Consequently, Au had a colorable claim that an appearance of impropriety warranted Chairperson Alston's recusal or disqualification pursuant to RSCH Rule 2.5(a). However, "[a] party asserting grounds for disqualification must timely present the objection, either before the commencement of the proceeding or as soon as the disqualifying facts become known." *In re Water Use Permit Applications*, 94 Hawai'i 97, 122, 9 P.3d 409, 434 (2000). "Unless the matters of disqualification are unknown to the party at the time of the proceeding and are newly discovered, there can be no excuse for delaying the filing of the suggestion until after rulings are made in the matter, particularly where such rulings may be considered adverse to the movant." *In re H. Bouslog, An Attorney at Law*, 41 Haw. 270, 274 (1956).

The record reflects that Au informed Chairperson Alston about Au's claim to a portion of Alteka's attorneys' fees award in the Alteka Matter as early as March 29, 2000. The record also reflects that Chairperson Alston immediately disputed Au's claim to a portion of Alteka's attorneys' fees

---

5. Effective April 15, 2004, the legislature amended HRS § 601–7(a) so that subsection (a) now provides:

§ 601–7. Disqualification of judge; relationship, pecuniary interest, previous judgment, bias or prejudice.

(a) No person shall sit as a judge in any case in which:

(1) The judge's relative by affinity or consanguinity within the third degree is counsel, or interested either as a plaintiff or defendant, or in the issue of which the judge has, either directly or through such relative, a more than de minimus pecuniary interest; or

(2) The judge has been of counsel or on an appeal from any decision or judgment rendered by the judge;

provided that no interests held by mutual or common funds, the investment or divestment of which are not subject to the direction of the judge, shall be considered pecuniary interests for purposes of this section; and after full disclosure on the record, parties may waive disqualification due to any pecuniary interest. 2004 Haw. Sess. L. Act 5, §§ 1 and 3 at 7.

award on March 29, 2000, more than seven months *before* the ODC filed its November 14, 2000 petition for discipline against Au, eighteen months *before* the Board's September 28, 2001 appointment of Chairperson Alston as the chairperson of Au's hearing committee, and thirty-four months *before* the January 21, 2003 commencement of the hearing committee's evidentiary hearings. Nevertheless, Au did *not* move for Chairperson Alston's recusal or disqualification until November 6, 2003, *after* most of the hearing committee's evidentiary hearings had concluded, and *after* Chairperson Alston had advised Au that "it's the unanimous view of the Panel that, in fact, you have not testified truthfully[.]" It appears that Au deliberately refrained from raising the issue of Chairperson Alston's conflict of interest in the disciplinary proceedings prior to the evidentiary hearings, instead waiting to raise the conflict of interest issue only *after* Chairperson Alston indicated that the hearing committee was probably going to recommend a disciplinary sanction against Au.

 "Litigants cannot take the heads-I-win-tails-you-lose position of waiting to see whether they win and if they lose moving to disqualify a judge who voted against them." *Schurz Communications, Inc. v. Federal Communications Comm'n*, 982 F.2d 1057, 1060 (7th Cir.1993). "The requirement of timeliness prohibits knowing concealment of an ethical issue for strategic purposes." *Id.* (citation and internal quotation marks omitted). The record reflects that Au's motion for Chairperson Alston's recusal or disqualification was *not* timely. Therefore, although Au had a colorable claim that an appearance of impropriety warranted Chairperson Alston's recusal or disqualification as the chairperson of Au's hearing committee, Au effectively waived the issue. Accordingly, Chairperson Alston and the hearing committee did not err by denying Au's untimely motion for Chairperson Alston's recusal or disqualification.

2. *The Purported Conflict of Interest Arising Out of the Kida Matter Did Not Require Chairperson Alston's Recusal or Disqualification in the Disciplinary Proceedings.*

 We need not reach the issue of whether the Kida Matter created a conflict of interest for Chairperson Alston that required his recusal or disqualification in Au's disciplinary proceedings. Assuming arguendo that a conflict of interest existed, Au himself created the conflict after the evidentiary hearings had already commenced.

> It is clear ... that tactical abuse becomes possible if a lawyer's appearance can influence the recusal of a judge known to be on a panel. Litigants might retain new counsel for rehearing for the very purpose of disqualifying a judge who ruled against them. As between a judge already assigned to a panel, and a lawyer who thereafter appears in circumstances where the appearance might cause an assigned judge to be recused, the lawyer will go and the judge will stay. This practice preserves the neutral and random assignment of judges to cases, and it implements the inherent power of [the] Court to manage and control its docket.... So the failure of counsel to consider in advance the known or knowable risk of a judge's recusal may result in the rejection of the appearance by that lawyer or firm.

*In re Federal Communications Comm'n*, 208 F.3d 137, 139–140 (2d Cir.2000) (citation and internal quotation marks omitted).

> A lawyer's acceptance of employment solely or primarily for the purpose of disqualifying a judge creates the impression that, for a fee, the lawyer is available for sheer manipulation of the judicial system. It thus creates the appearance of professional impropriety. Moreover, sanctioning such conduct brings the judicial system itself into disrepute. To tolerate such gamesmanship would tarnish the concept of impartial justice. To permit a litigant to blackball a judge merely by invoking a talismanic right to counsel of [his or her] choice would contribute to skepticism about and mistrust of our judicial system.

*McCuin v. Texas Power & Light Co.*, 714 F.2d 1255, 1265 (5th Cir.1983) (quotation marks omitted).

Au did not represent any parties in the Kida Matter while Chairperson Alston and

**340**

the hearing committee were conducting the evidentiary hearings for Au's disciplinary matters on January 21, January 22, and April 29, 2003. Shigemura represented Kida, and Chairperson Alston's law firm, AHFI, represented Beneficial. Only four months after the primary evidentiary hearings had concluded did Au first appear in the Kida Matter as legal counsel for Shigemura.

Soon after Au appeared in the Kida Matter, he moved the circuit court (on Shigemura's behalf) to disqualify Chairperson Alston's law firm, AHFI, from representing Beneficial. The circuit court denied Au's motion. Then, on November 6, 2003, Au moved the hearing committee for Chairperson Alston's recusal or disqualification in the disciplinary proceedings. Considering that the bulk of the evidentiary hearings had concluded by April 29, 2003, it would have been improper for the hearing committee to require Chairperson Alston's recusal or disqualification based on Au's August 2003 appearance in the Kida Matter. The hearing committee correctly rejected Au's argument that his involvement in the Kida Matter warranted Chairperson Alston's disqualification in the disciplinary matter.

### B. *The Record Supports the Findings of Fact and Conclusions of Law Regarding Au's Misconduct.*

We have reviewed Au's numerous arguments, but we do not address each of them in this opinion. In several instances, Au has admitted facts that support, in whole or in part, the ODC's allegations of his misconduct. For example, with respect to the ODC's allegations that Au misrepresented the holding in *Sherry v. Ross*, 846 F.Supp. 1424 (D.Haw.1994), to Judge Heely, the record reflects that Au apologized to Judge

Heely in a letter dated July 31, 1995, "for misciting *Sherry v. Ross*[,]" and Au "admit[ted that he] was in error." With respect to the ODC's various allegations that Au mishandled client funds, Au admits that "[t]he Office Account was occasionally used for the purpose of depositing client's settlement checks."

▆ In addition to Au's admissions, the ODC adduced substantial evidence in support of its allegations of Au's misconduct. Although Au argues he was not aware that he was violating the HRPC, the hearing committee specifically found that "Respondent [Au] knew that the payment of a referral fee to a non-lawyer, such as Mr. Yoshimoto, was unethical." Furthermore, "mere ignorance of the law constitutes no defense to its enforcement." *Hirono v. Peabody*, 81 Hawai'i 230, 234, 915 P.2d 704, 708 (1996) (citation omitted). "This maxim holds particularly true for lawyers who are charged with notice of the rules and the standards of ethical and professional conduct prescribed by the [c]ourt." *Florida Bar v. Dubow*, 636 So.2d 1287, 1288 (Fla.1994).[6]

▆ Au asserts that the ODC did not prove by clear and convincing evidence that he improperly paid fees to a non-lawyer "runner" to obtain client referrals. Au argues, among other things, that the ODC did not properly authenticate the audiotapes and corresponding transcripts from Yoshimoto's surreptitiously recorded August 16 and 29, 1994 conversations with him regarding the client referral agreement.

We note that, in disciplinary proceedings, "[t]he hearing committee or officer shall not be bound by the formal rules of evidence, but shall admit only trustworthy evidence."

---

6. *See also Normand v. Orkin Exterminating Co., Inc.*, 193 F.3d 908, 911 (7th Cir.1999) ("Ignorance of the law, especially by a lawyer, is no defense to noncompliance with the rules of the court in which he appears."); *In re Cheronis*, 114 Ill.2d 527, 104 Ill.Dec. 225, 502 N.E.2d 722, 725–26 (1986) ("A common maxim holds that ignorance of the law is no excuse, and this is particularly true in a case where the person who claims lack of knowledge of a relevant directive is a practicing attorney."); *Iowa Supreme Court Board of Professional Ethics and Conduct v. Gallner*, 621 N.W.2d 183, 188 (Iowa 2001) ("Never-

theless, ignorance of the law or erroneous advice does no excuse a breach of ethics by a lawyer."); *State ex rel. Nebraska State Bar Association v. Hollstein*, 202 Neb. 40, 274 N.W.2d 508, 517 (1979) ("We have repeatedly recognized the ancient maxim that ignorance of the law is no excuse.... It applies with even greater emphasis to an attorney at law who is expected to be learned in the law." (Citation and internal quotation marks omitted.)); *Whelan's Case*, 136 N.H. 559, 619 A.2d 571, 573 (1993) ("We hold that lawyers, upon admission to the bar, are deemed to know the Rules of Professional Conduct.").

RSCH Rule 2.7(c). Yoshimoto testified that, with minor exceptions, the audiotapes and corresponding transcripts were true and accurate recordings of Yoshimoto's conversations with Au on August 16 and 29, 1994. Au contested the authenticity and accuracy of the audiotapes and corresponding transcripts, but when the hearing committee gave Au an opportunity to show the purported inaccuracies and omissions by submitting an annotated copy of the transcripts to the hearing committee, Au did not do so. After assessing the demeanor and credibility of Yoshimoto and Au, the hearing committee admitted the audiotapes and corresponding transcripts into evidence.

Regardless of whether the ODC properly authenticated the audiotapes and transcript, the ODC additionally adduced the direct testimony of Yoshimoto, who stated that he had an agreement with Au, under which Yoshimoto would find legal clients and refer them to Au in exchange for Au's payment of five percent of the gross amount of any settlement that Au would eventually recover for the clients. In contrast, Au testified that he did not have a client referral agreement with Yoshimoto. Therefore, the credibility of Yoshimoto and Au became a pivotal issue. After assessing the demeanor and credibility of the witnesses, the hearing committee found that Yoshimoto had an adequate recollection of his dealings with Au. Furthermore, the hearing committee found that "Respondent[ Au]'s defense against this charge was based upon false testimony about the nature of his agreement with Wayne Yoshimoto. Instead of testifying truthfully, Respondent [Au] attempted to mislead and deceive the ODC and the Panel regarding his dealings with Wayne Yoshimoto." We generally give weight to such credibility determinations made by fact-finders who had an opportunity to observe the witnesses. *In re W.D.P.*, 104 Hawai'i 435, 444, 91 P.3d 1078, 1087 (2004).

We conclude that clear and convincing evidence in the record supports the hearing committee's findings of fact and conclusions of law regarding Au's misconduct.

### C. *A Five–Year Suspension Is Appropriate*

■ Although the Board is recommending that this court suspend Au from the practice of law for two years, the ODC asserts that we should adopt the hearing committee's recommendation to disbar Au. "While disciplinary proceedings may possess punitive attributes, punishment is not their purpose. Rather, the purpose of suspension or disbarment is to protect the public and to maintain the integrity of the legal profession and the dignity of the courts." *Office of Disciplinary Counsel v. Breiner*, 89 Hawai'i 167, 173, 969 P.2d 1285, 1291 (1999). Under RSCH Rule 2.3(a), there are six types of discipline:

(1) Disbarment by the supreme court; or

(2) Suspension by the supreme court for a period not exceeding five years; or

(3) Public censure by the supreme court; or

(4) Public reprimand by the Disciplinary Board with the consent of the respondent and Counsel; or

(5) Private reprimand by the Disciplinary Board with the consent of the respondent and Counsel; or

(6) Private informal admonition by Disciplinary Counsel or Disciplinary Board.

RSCH Rule 2.3(a).

■ "The ABA Standards are a useful reference when determining disciplinary sanctions." *Office of Disciplinary Counsel v. Lau*, 79 Hawai'i 201, 206, 900 P.2d 777, 782 (1995) (citation omitted). The factors set out in ABA Standard 3.0 provide:

### 3.0 Generally

In imposing a sanction after a finding of lawyer misconduct, a court should consider the following factors:

(a) the duty violated;

(b) The lawyer's mental state;

(c) the actual or potential injury caused by the lawyer's misconduct; and

(d) the existence of aggravating or mitigating factors.

American Bar Association Center for Professional Responsibility, *Standards for Imposing Lawyer Sanctions* 3.0, at 25 (1991). A brief analysis of these four factors indicates

that a five-year suspension is the appropriate sanction for Au's misconduct.

### 1. *Au's Duties*

Au violated several duties to clients and the law profession. The most serious breaches of duty are set out below.

#### a. *Duty to Refrain from Dishonesty*

When Au (1) misrepresented the holding of a published opinion to a judge and (2) falsely certified that he had maintained his clients' funds in accordance with HRPC Rule 1.15, Au violated his duty to refrain from dishonesty under HRPC Rule 3.3(a)(1) and HRPC Rule 8.4(c). ABA Standard 7.0 provides the following:

> 7.0 Violations of Duties Owed to the Profession
>
> . . . .
>
> 7.1 Disbarment is generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed to the profession with the intent to obtain a benefit for the lawyer or another, and causes serious or potentially serious injury to a client, the public, or the legal system.
>
> . . . .
>
> 7.2 Suspension is generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed to the profession, and causes injury or potential injury to a client, the public, or the legal system.
>
> . . . .
>
> 7.3 Reprimand is generally appropriate when a lawyer negligently engages in conduct that is a violation of a duty owed to the profession, and causes injury or potential injury to a client, the public or the legal system.
>
> . . . .
>
> 7.4 Admonition is generally appropriate when a lawyer engages in an isolated instance of negligence in determining whether the lawyer's conduct violates a duty owed to the profession, and causes little or no actual or potential injury to a client, the public, or the legal system.

American Bar Association Center for Professional Responsibility, *Standards for Imposing Lawyer Sanctions* 7.0, at 45–46 (1991). The record shows that Au knowingly misrepresented the holding of a published opinion to a judge with the intent to obtain a benefit for his client, and, in so doing, Au caused potentially serious injury to the public and the legal system. Although Au was apparently negligent in falsely certifying that he had maintained his clients' funds in accordance with HRPC Rule 1.15, this misconduct also caused potentially serious injury to the public and the legal system.

#### b. *Duty to Provide Competent Representation*

When Au misrepresented the holding of a published opinion to a judge, Au violated his duty to provide competent representation under HRPC Rule 1.1. ABA Standard 4.5 provides:

> 4.5 Lack of Competence
>
> Absent aggravating or mitigating circumstances, upon application of the factors set out in Standard 3.0, the following sanctions are generally appropriate in cases involving a failure to provide competent representation to a client:
>
> 4.51 Disbarment is generally appropriate when a Lawyer's course of conduct demonstrates that the lawyer does not understand the most fundamental legal doctrines or procedures, and the lawyer's conduct causes injury or potential injury to a client.
>
> . . . .
>
> 4.52 Suspension is generally appropriate when a lawyer engages in an area of practice in which the lawyer knows he or she is not competent, and causes injury or potential injury to a client.
>
> . . . .
>
> 4.53 Reprimand is generally appropriate when a lawyer:
>
> (a) demonstrates failure to understand relevant legal doctrines or procedures and causes injury or potential injury to a client; or
>
> (b) is negligent in determining whether he or she is competent to handle a

legal matter and causes injury or potential injury to a client.

. . . .

4.54 Admonition is generally appropriate when a lawyer engages in an isolated instance of negligence in determining whether he or she is competent to handle a legal matter, and causes little or no actual or potential injury to a client.

American Bar Association Center for Professional Responsibility, *Standards for Imposing Lawyer Sanctions* 4.5, at 33–34 (1991). When Au misrepresented the holding of a published opinion to a judge, Au violated one of the most fundamental legal doctrines, namely, that a lawyer must not make a false statement of material fact or law to a court. Au's conduct caused potential injury to his client by doing so.

c. *Duty to Maintain Personal Integrity*

When Au (1) misrepresented the holding of a published opinion to a judge and (2) improperly used a non-lawyer "runner" to obtain client referrals, Au violated his duty to maintain personal integrity under HRPC Rules 3.3(a)(1), 7.2(c), 8.4(a), and 8.4(c). ABA Standard 5.1 provides:

5.1 Failure to Maintain Personal Integrity

Absent aggravating or mitigating circumstances, upon application of the factors set out in 3.0, the following sanctions are generally appropriate in cases involving the commission of a criminal act that reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer in other respects, or in cases with conduct involving dishonesty, fraud, deceit, or misrepresentation:

5.11 Disbarment is generally appropriate when:

(a) a lawyer engages in serious criminal conduct a necessary element of which includes intentional interference with the administration of justice, false swearing, misrepresentation, fraud, extortion, misappropriation, or theft; or the sale, distribution or importation of controlled substances; or the intentional killing of another; or an attempt or conspiracy or solicitation of another to commit any of these offenses; or

(b) a lawyer engages in any other intentional conduct involving dishonesty, fraud, deceit, or misrepresentation that seriously adversely reflects on the lawyer's fitness to practice.

. . . .

5.12 Suspension is generally appropriate when a lawyer knowingly engages in criminal conduct which does not contain the elements listed in Standard 5.11 and that seriously adversely reflects on the lawyer's fitness to practice.

. . . .

5.13 Reprimand is generally appropriate when a lawyer knowingly engages in any other conduct that involves dishonesty, fraud, deceit, or misrepresentation and that adversely reflects on the lawyer's fitness to practice law.

. . . .

5.14 Admonition is generally appropriate when a lawyer engages in any other conduct that reflects adversely on the lawyer's fitness to practice law.

American Bar Association Center for Professional Responsibility, *Standards for Imposing Lawyer Sanctions* 5.1, at 36–37 (1991). When Au (1) misrepresented the holding of a published opinion to a judge and (2) improperly used a non-lawyer "runner" to obtain client referrals, Au engaged in intentional conduct involving dishonesty, fraud, deceit, or misrepresentation that seriously adversely reflected on Au's fitness to practice law.

d. *Duty to Preserve Clients' Property*

When Au mishandled his clients' funds in several ways, Au violated his duty to preserve his clients' property under HRPC Rule 1.15. ABA Standard 4.1 provides:

4.1 Failure to Preserve the Client's Property

Absent aggravating or mitigating circumstances, upon application of the factors set out in 3.0, the following sanctions are generally appropriate in cases involving the failure to preserve client property:

4.11 Disbarment is generally appropriate when a lawyer knowingly converts client property and causes injury or potential injury to a client.

. . . .

4.12 Suspension is generally appropriate when a lawyer knows or should know that he is dealing improperly with client property and causes injury or potential injury to a client.

. . . .

4.13 Reprimand is generally appropriate when a lawyer is negligent in dealing with client property and causes injury or potential injury to a client.

. . . .

4.14 Admonition is generally appropriate when a lawyer is negligent in dealing with client property and causes little or no actual or potential injury to a client.

American Bar Association Center for Professional Responsibility, *Standards for Imposing Lawyer Sanctions* 4.1, at 26–28 (1991). The commentary on ABA Standard 4.12 recommends that "[s]uspension should be reserved for lawyers who engage in misconduct that does not amount to misappropriation or conversion." *Id.* 4.12 cmt., at 27. "The most common cases involve lawyers who commingle client funds with their own, or fail to remit client funds promptly." *Id.*

7. 9.22 Factors which may be considered in aggravation.

Aggravating factors include:
 (a) prior disciplinary offenses;
 (b) dishonest or selfish motive;
 (c) a pattern of misconduct;
 (d) multiple offenses;
 (e) bad faith obstruction of the disciplinary proceeding by intentionally failing to comply with rules or orders of the disciplinary agency;

When Au mishandled his clients' funds, Au knew or should have known that he was dealing improperly with client property, and Au caused potential injury to his clients.

### 2. *Au's State of Mind*

The record shows that Au committed a significant portion of his misconduct with an intentional and/or knowing state of mind.

### 3. *The Harm or Potential Injury that Au Caused*

Au's misconduct does not appear to have caused actual harm to his clients. However, Au's misconduct caused potentially serious injury to his clients. Furthermore, Au's misconduct seriously harmed the integrity of the legal system.

### 4. *Aggravating and Mitigating Factors*

#### a. *Aggravating Factors*

Under ABA Standard 9.21, aggravating factors or circumstances "[m]ay justify an increase in the degree of discipline to be imposed." American Bar Association Center for Professional Responsibility, *Standards for Imposing Lawyer Sanctions* 9.21, at 15 (1991). Of the ten possible aggravating factors that ABA Standard 9.22 [7] recognizes, the hearing committee found the following six aggravating factors with respect to Au:

[1.] Dishonest or selfish motive (ABA Standard 9.22(b)). Respondent [Au] was motivated by monetary gain by the use of a runner and in depositing unearned fees into his Office Account. . . .

[2.] A Pattern of misconduct (ABA Standard 9.22(c)). Respondent [Au] has engaged in a pattern of misconduct in his accounting practices. In addition, Respondent [Au] has also a pattern of misrepre-

 (f) submission of false evidence, false statements, or other deceptive practices during the disciplinary process;
 (g) refusal to acknowledge wrongful nature of conduct;
 (h) vulnerability of victim;
 (i) substantial experience in the practice of law;
 (j) indifference to making restitution.
American Bar Association Center for Professional Responsibility, *Standards for Imposing Lawyer Sanctions* 9.22, at 15 (1991).

sentation in his citation of the Sherry2 decision, his denial of the accuracy and completeness of the tapes and transcripts of the August 16 and 29, 1994 conversations, his filing false annual registration statements, and his false testimony regarding payment to his clients prior to negotiating the settlement checks.

[3.] Multiple offenses (ABA Standard 9.22(d)). Respondent [Au] There are multiple, unrelated instances of unethical conduct in this matter.

[4.] Submission of false evidence, false statements, or other deceptive practices during the disciplinary process (ABA Standard 9.22(f)). As stated above, Respondent [Au] falsely testified at the Formal Hearing (1) that he first paid his clients, then deposited the settlement checks into his Office account; (2) that he had no illicit referral agreement with Mr. Yoshimoto; and (3) that he paid Mr. Yoshimoto investigation fees for services rendered to Ms. Labrador.

[5.] Refusal to acknowledge wrongful nature of conduct (ABA Standard 9.22(g)). Although Respondent [Au] has acknowledged that he committed certain acts, he has denied that those acts were unethical. Respondent [Au] falsely denied hiring Wayne Yoshimoto as a runner and paying him illicit referral fees. When given opportunities to recant this false testimony, he refused. Instead of addressing the issues in good faith, he repeatedly made baseless arguments and attempted to divert attention from his misconduct to irrelevant issues, such as the qualifications of the person who transcribed the tapes and his dealings with other lawyers.

■ Substantial experience in the practice of law (ABA Standard 9.22(i)). Respondent [Au] was admitted to practice in 1963 and has practiced for most of the past 40 years.

### b. Mitigating Factors

Under ABA Standard 9.31, mitigating factors or circumstances "[m]ay justify a reduction in the degree of discipline to be imposed." American Bar Association Center for Professional Responsibility, Standards for Imposing Lawyer Sanctions 9.31, at 15 (1991). Of the thirteen possible mitigating factors that ABA Standard 9.32[8] recognizes, the hearing committee found only two with respect to Au:

[1.] Absence of prior disciplinary record (ABA Standard 9.32(a)). Respondent [Au] has no prior discipline.

[2.] Correction of Accounting Practices; Lack of Material Economic Harm to Clients Due to Accounting Practices. When Respondent [Au] learned that his accounting/bookkeeping practice were improper, he corrected them. His improper practices do not appear to have caused any material economic harm to any client or third party.

## IV. CONCLUSION

Based on the forgoing analysis, we hereby accept the hearing committee's findings of fact and conclusions of law. However, we reject (a) the hearing committee's recommendation to publicly censure and disbar Au and (b) the Board's recommendation to suspend Au from the practice of law for two years. Under the circumstances of this case, disbar-

8. 9.32 Factors which may be considered in mitigation.
Mitigating factors include:
(a) absence of a prior disciplinary record;
(b) absence of a dishonest or selfish motive;
(c) personal or emotional problems;
(d) timely good faith effort to make restitution or to rectify consequences of misconduct;
(e) full and free disclosure to disciplinary board or cooperative attitude toward proceedings;
(f) inexperience in the practice of law;
(g) character or reputation;
(h) physical or mental disability or impairment;
(i) delay in disciplinary proceedings;
(j) interim rehabilitation;
(k) imposition of other penalties or sanctions;
(l) remorse;
(m) remoteness of prior offenses.
American Bar Association Center for Professional Responsibility, Standards for Imposing Lawyer Sanctions 9.32, at 15–16 (1991).

ment would be too severe a sanction, and yet a suspension of less than five years would be insufficient to reflect our concern for the protection of the public, the legal profession, and the courts from Au's unprofessional conduct. Therefore, an order suspending Au from the practice of law for a period of five years will be entered contemporaneously with the filing of this opinion.